[Crim. No. 1616. First Appellate District, Division One.—May 23, 1931.]

THE PEOPLE, Respondent, v. FRED MILLER, Appellant.

George D. Pollock and B. R. McCabe for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

KNIGHT, J.—One Al Millford was killed by appellant Fred Miller in a fistic encounter which took place in front of a pool-hall in the town of Chualar, Monterey County, shortly after 5 o'clock on the evening of October 3, 1930. As a result of the homicide, Miller was charged with murder and upon trial before a jury was convicted of manslaughter. Insufficiency of evidence is urged as the first ground of appeal, appellant claiming that it was established at the trial that he acted in necessary self-defense and without any intention to take life.

The two men were employed as laborers in the lettuce industry in the Salinas Valley and Miller was the smaller and the younger of the two. The evidence shows quite clearly that Millford started the quarrel inside the pool-hall by grossly reviling Miller, and, as he claims, threatening to assault him; but there is a sharp conflict in the testimony as to which left the pool-hall first, and as to what happened outside. Miller testified that in order to avoid any trouble with Millford he arose from the chair in which he was seated and walked out of the pool-hall, and that Millford followed him. His statement in this regard was corroborated by two other witnesses. He further testified that just outside the door Millford grappled with him and during the scuffle struck him several times, and that finally he succeeded in landing a blow between Millford's eyes, which dazed Millford, but did not knock him down, following which he, Miller, backed away, shook his fist at Millford and went back into the pool-hall.

The testimony of the other witnesses in the case, however, discloses an entirely different state of facts. It appears therefrom that Miller shoved Millford backwards out of and away from the pool-hall door into the street; that thereupon they scuffled around to the side of the pool-hall where Miller knocked Millford to the ground unconscious; that Miller then leaped upon Millford and kneeling astraddle of him struck him repeatedly about the head and face while he was lying prone on his back on the ground; that Miller then arose and shook his fist at Millford's prostrate form, brushed his clothes and re-entered the pool-room; whereupon some of the bystanders raised Millford from the ground and tried to revive him, but he was dead.

The foregoing facts were established chiefly by the testimony of three witnesses, a schoolboy fifteen years old, named Leon Shook, who was standing outside of and near the pool-hall and saw the entire affair from the time the two men emerged through the pool-room door until Miller returned therein, and Mr. and Mrs. O'Nall, who were inside their home, close to the pool-hall, looking through the window and saw what occurred after the men reached the street.

As stated, appellant was the smaller of the two men. He was much shorter and weighed considerably less than Millford and throughout the boy's testimony he referred to them generally as the short man and the tall man. He testified that he saw them as they came out of the door of the pool-hall; that "the man who got killed", as he expressed it, "was trying to get into the pool-hall . . . and the other was trying to keep him out"; that the short man pushed the other man outside and then "started fighting him"; that they scuffled around to the side of the pool-hall; that "the short fellow was doing most of the fighting" and the other man "was defending himself, holding his arms in front of him"; that "he didn't want to fight and he was backing away to get away from the other man"; that finally the short man knocked him down and then "jumped on him and started beating him in the face"; that after the tall man was knocked down he did not do anything; that he lay on the ground, and the short man, kneeling astraddle of him, hit him many times on the side of the head; that the short man "grabbed him by the head and hit him on the side of the face". Continuing, the boy testified that after the tall man had been thus beaten the short man got up and "said he would not have any argument out of the man", and after brushing his clothes walked back into the pool-hall, leaving the tall man lying on the ground; that the man on the ground "just raised slightly from the ground, coughed real hard and then fell back again". O'Nall testified in substance that he was looking through the window of his home and "saw two men out in the street wrestling like they were fighting". Continuing, he said: "I seen one man strike the other a couple of times and he went down and he jumped on top of him and hit him a couple of times

more and he got up and shook his fist at him and walked away.'' He further stated that after the man was knocked down he did not move, and appeared to be unconscious. On cross-examination, however, the witness somewhat qualified his testimony by stating that both men fell to the ground about the same time. Mrs. O'Nall's testimony was substantially the same.

Appellant's version as to what occurred outside of the pool-hall was contradicted also by the testimony of two of his own witnesses, one named Elder and the other was O'Nall's son, Eugene O'Nall. The latter stated that when he reached the scene he saw one man lying on his back on the ground and the other man ''astraddle him'', hitting him while he was on his back, after which the man on top arose, shook his fist at the man lying on the ground, and went into the pool-hall. Elder testified that both fell to the ground together, but contrary to the boy's testimony stated that the men were struggling on the ground and that Miller struck Millford only once.

Furthermore, the result of the autopsy strongly corroborated the evidence adduced on the part of the prosecution, and shows clearly that Millford was severely beaten and that the punishment he received was the direct cause of his death. With reference thereto the autopsy surgeon testified that in addition to the presence of several superficial cuts and wounds about the head and face, there was a bruise on the cranium near the top of the head from the suture between the parietal and the frontal bones on the left side of the head extending through the scalp and periosteum, and leaving a discoloration on the bone itself; and another bruise well up toward the top of the head over the occipital bone on the left side; and upon opening the cranial cavity extensive blood clots were found all over the surface of the brain; that hemorrhages causing the clots came from ruptured blood vessels at the base of the brain and in the spinal cord. And as to the latter he stated that although the spinal cord was not absolutely severed from the brain, it was twisted and torn, which, together with the damage done to the blood vessels, was the immediate cause of death.

It is unnecessary to narrate in greater detail the testimony of the various witnesses as to what occurred

outside the pool-hall because, as will be noted from the foregoing, the evidence is in sharp conflict, and consequently in that state the decision of the jury upon the issue of self-defense is controlling on appeal. (*People* v. *Hecker*, 109 Cal. 451 [30 L. R. A. 403, 42 Pac. 307].) ■ As held in the case just cited, the acts which a defendant may do and justify under a plea of self-defense depend, primarily, upon his own conduct, and secondarily, upon the conduct of the deceased. And where, as here, a defendant charged with murder and convicted of manslaughter claims self-defense and that the verdict is against the evidence —the killing being admitted, and the conduct of the defendant prior to the killing being apparently free from fault—it is a question for the jury to decide, from all the circumstances attending the homicide, whether the conduct of the deceased preceding and at the time of the killing was sufficient to justify the defendant in an honest belief, as a reasonable man, that he was in danger of his life or of immediate bodily harm from the hands of the deceased; and if the evidence be substantially conflicting on that question, and the reasonable inference may be drawn therefrom that the killing was not justified, but was the result of passion suddenly inflamed from vile epithets hurled by the deceased at defendant, or that the force used was clearly greater than was necessary and wholly disproportionate to any injury offered or given and that defendant acted in a spirit of revenge, the verdict is sufficiently supported. (*People* v. *Brown,* 15 Cal. App. 393 [114 Pac. 1004]; *People* v. *Hecker, supra.*)

■ Appellant assails the truthfulness of the testimony of the boy, claiming, first, that he did not witness the combat at all, because some of the witnesses stated that they did not see him at the scene of the quarrel; and, secondly, that if he did witness the homicide he was confused in his identification of the parties. But the mere fact that some of the others did not observe his presence there surely does not serve as ground for holding as a matter of law that his entire testimony was based upon fiction and imagination, particularly in view of the manner in which he withstood the rigorous cross-examination; and there are ample circumstances disclosed by his testimony to show that he was not mistaken in the identity of the parties,

especially since Miller was approximately six inches shorter and weighed about thirty pounds less than Millford. In any event, the credibility of the witnesses, the weight to be given their testimony and the deductions to be drawn therefrom are all matters which must be addressed necessarily to the consideration of and passed upon by the jury.

Appellant calls attention to the testimony given by a number of witnesses to the effect that the general reputation of the deceased for peace and quiet was bad and that the reputation of appellant for those traits of character was good. But the main purpose of such testimony was to aid the jury in determining which of the two men was the aggressor; and since that question was embraced within the issue of self-defense and constituted a necessary element thereof and the jury decided adversely to appellant on that issue, the matter of the general reputation becomes unimportant on appeal.

Appellant contends that the evidence is insufficient also to prove either malice, premeditation, or an intent to kill. Malice and premeditation, however, form no part of the crime of manslaughter. If those elements are present the crime is murder and not manslaughter (13 Cal. Jur. 607); and the necessity of proving an intent to kill depends upon the kind of manslaughter sought to be established. That is to say: Manslaughter, as defined by the code, is the unlawful killing of a human being without malice, and is of two kinds: voluntary, upon a sudden quarrel or heat of passion; and involuntary, in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. (Pen. Code, sec. 192.) And it is held that while in the first kind there must be present an intent to kill, in the second kind such intent is not essential. In other words, in cases of voluntary manslaughter, although the elements of malice and premeditation are wanting, an intent to kill must exist, and the question of its presence becomes one of fact for the jury to determine from all the circumstances under which the homicide was committed. But involuntary manslaughter, as the code defines it, is the taking of life in certain unlawful ways without any intention of doing so (see cases cited in 13 Cal. Jur. 608); and

consequently the killing is involuntary manslaughter "where death occurred, without malice or any intent to kill, but in the commission of an unlawful act not amounting to a felony". (13 Cal. Jur. 614.) ██ Therefore, in the case at bar, even though it be held that the evidence is insufficient as a matter of law to prove an intent to kill, and that consequently a case of voluntary manslaughter has not been established, nevertheless there is ample evidence to sustain the verdict because, if, as the jury in effect found, appellant did not act in necessary self-defense, it follows that the physical punishment he inflicted upon Millford amounted to an assault and battery, and consequently constituted the commission of an unlawful act not amounting to a felony, and death having resulted therefrom, the killing was involuntary manslaughter even though there was no intent to take life.

██ On cross-examination of the autopsy surgeon by counsel for appellant, in connection with an inquiry as to whether he could determine from the weight of a dead man's body whether in life he was a powerful man, he was asked: "Are you an expert, Doctor?" and he replied that he was not. The answer was stricken out on motion of the district attorney and the ruling is assigned as error. The ruling was evidently harmless because obviously by stating he was not an expert the witness did not have in mind his qualifications as a medical expert, but meant merely that he would not presume to judge a man's physical strength in life by the weight of his body after death. In any event we think the ruling was technically correct for the reason that it is for the court and not the witness to say whether the witness is an expert and may testify as such; and here the qualifications of the autopsy surgeon as a medical expert were admitted at the commencement of his testimony.

██ During the course of the trial the court propounded certain questions to some of the witnesses, and appellant assigns the asking thereof as error. There was no objection made at the time the questions were put to the witnesses, nor was the asking of the same assigned as misconduct; and it is not claimed here that the questions were improper in form or elicited irrelevant matter; but it is contended that the asking thereof indicated a desire on

the part of the court to aid the prosecution in the presentation of its case, which must have influenced the jury in its deliberations upon the merits. It is true, as appellant argues, that sometimes juries are in danger of being influenced unconsciously by an attitude of hostility on the part of the judge presiding at the trial; but a feeling thus created is not always against the defendant; it is just as likely to be in his favor; and it is important therefore that the judge should maintain the poise of having an open and unprejudiced mind (24 Cal. Jur. 735). It frequently becomes necessary in the interests of justice, however, for the judge to propound a limited number of questions to certain witnesses, either to clarify a situation brought about by confusion, or because of an apparent misunderstanding on the part of the witness of the questions propounded to him by counsel, or to elicit the truth from a belligerent or evasive witness; and after carefully examining the record in the present case in connection with the objections made by appellant we are convinced that such were the purposes of the trial judge in asking the questions to which appellant has taken exception, and that the situation is far from being one which would call for a reversal upon the ground that the verdict of the jury was the product of prejudice. (*People* v. *Dad,* 51 Cal. App. 182 [196 Pac. 566].)

There being sufficient evidence to support the verdict of the jury and the record in our opinion being free from error, the judgment and order denying the motion for new trial are affirmed.

Tyler, P. J., and Cashin, J., concurred.