[Crim. No. 2224. Third Dist. Mar. 5, 1951.]

THE PEOPLE, Respondent, v. JOSEPH P. CAYER, Appellant.

[Crim. No. 2225. Third Dist. Mar. 5, 1951.]

THE PEOPLE, Respondent, v. LLOYD SUNDERLAND, Appellant.

Frederick H. Vercoe and Nathaniel S. Colley for Appellants.

Edmund J. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

ADAMS, P. J.—These two cases will be considered together since the charges grew out of the same episode, appellants were tried together and their appeals are here on the same trial transcript.

Each appellant was charged in a separate amended information with the crime of murdering one William James Bailey on August 20, 1949. A jury convicted them of murder of the second degree and judgments were entered accordingly. Their motions for new trials were denied and they have taken separate appeals from the judgments and from the orders denying the new trials.

The following facts find support in the record. Colonel McCrillis and his daughter Jane operated the Belden Resort in Plumas County. The resort maintained a barroom, dance hall and card room. Cayer was there employed as a bartender, Sunderland as manager of the bar, and the deceased as card dealer. According to the testimony of Jane McCrillis she arranged to relieve Cayer as bartender between 6 and 6:30 o'clock in the afternoon of August 20th because he was not sober enough to be on duty behind the bar. Sunderland resented Miss McCrillis' action because she went over his head as manager of the bar, and he resigned.

### The Case Against Cayer

■ We are governed by the rule that the evidence must be reviewed in the light most favorable to the prosecution. (*People* v. *Dukes,* 90 Cal.App. 657, 659 [266 P. 558], cited in *People* v. *Milo,* 89 Cal.App.2d 705, 707 [201 P.2d 556].)

Cayer became obsessed with the idea that Bailey had reported him drunk to Miss McCrillis, and when Bailey entered the barroom from the card room between 7:30 and 7:40 in the evening, Cayer accused him of reporting him to Miss McCrillis and charged him with being a stool pigeon. Deceased replied, "No, you're wrong." Thereupon Cayer struck deceased with his fist. Miss McCrillis testified that deceased had not reported anything to her and that he had nothing to do with relieving Cayer as bartender. Cayer was a young man and had not been out of the Navy very long, while Bailey was about 58 years old. The following will show that Cayer gave the deceased a terrific beating.

John P. Marchello testified that he saw Cayer strike the decedent, and as the latter went down Sunderland picked him up and Cayer struck him again; that each time the deceased got up Cayer knocked him down again, and the third time

deceased did not get up; that after deceased was down Cayer kicked him in the head, the side of the face and in the ribs; that deceased was covered with blood from head to foot and that there was blood on the floor and walls.

Mildred Marchello testified that she saw Cayer hit the deceased and knock him down and then kick him while he was down; that a Mrs. McMahon went to the aid of the deceased, the fighting stopped and deceased was taken out; that while decedent was on the floor absolutely helpless, Cayer said to him, "Why don't you get up and fight, you son-of-a-bitch?" and deceased replied, "I can't, I can't"; that the deceased was a mass of blood and one couldn't tell who he was; that his shirt was torn and his face was just beat up to a mass of blood; that after deceased was taken out, Cayer and Sunderland came into the card room and Cayer said to Mr. Marchello: "Jimmie's [meaning the deceased] a friend of yours, and you tell the son-of-a-bitch the next time you see him we'll kill him."

Fred McMahon testified that when he saw Cayer strike the deceased he rushed up and grabbed Cayer around the neck and started to pull him off; that Sunderland grabbed him and shoved him away; that Cayer was on top and astride of the deceased and hitting him in the face and chest; that deceased was only trying to avoid punishment, and was not fighting; that deceased was bleeding, his clothing was terribly bloody, his nose was cut deep and he was bleeding from it and from his mouth; that the witness, his wife and Marchello helped the deceased out of the place; that he was pretty weak and had to be helped; that after the fight ended, Sunderland, in the presence of Cayer, said: "We'd beat him [deceased] every day until he left this canyon"; that both Cayer and Sunderland had been drinking; that while deceased was down Cayer ripped off decedent's shirt and rubbed it all over decedent's face, rubbing as hard as he could rub it in; that Cayer was astride decedent at that time.

Nestor A. Takala testified he arrived at the barroom and saw Cayer strike deceased three or four blows; that deceased went down in a prostrate condition on the floor and Cayer got astride him and continued hitting him; that the witness appealed to Sunderland to stop the fight and Sunderland told him to get away, it didn't concern him; that witness looked around for an acquaintance to help him stop the fight but saw none; that Cayer still had the deceased on the floor, was astride him and showering blows on deceased's body and face while decedent was merely trying to defend himself; that he

was on the floor on his back and in no position to fight back; that decedent was covered with blood and his shirt had been stripped off of him during the struggle.

George A. Wess testified that when he arrived deceased was lying on the floor and Cayer seemed to be kicking him in the side; that when deceased got partly up Cayer beat him down again and said: "I'd like to get another kick at him."

May McMahon testified that when she arrived deceased was on the floor and Cayer on top of him beating him in the face; that she guessed she started to scream and told them to stop the fight and they pulled Cayer and the latter pulled deceased to a sitting position and deceased kept saying: "You're wrong boys, you're wrong"; that this witness, with the aid of others, took the deceased to her apartment; that he was all blood, and she got towels and started washing him and trying to stop the blood that was so bad on his nose, and that she noticed blood coming out of his ears; that a man came in and she asked him to get a car quick to take the deceased to a doctor, and that deceased was taken to the Plumas Industrial Hospital at Quincy.

Emmie Hahn, a registered nurse at the hospital, testified that when deceased was brought in he had a cut on the left side of his lip, his left eye was blue above the lid, his nose was injured and nostrils crusted with blood; that he complained of pain in his face and in the region of his heart; that while she was cleaning him he had a "seizure," and was blue on the neck and face; that she called Dr. Carr who used a stethoscope and they tried to resuscitate decedent but he passed away.

Dr. Donald Bleiberg, the owner and operator of the hospital, testified as to cause of decedent's death: "Well, my opinion as to the cause of death was that he suffered heart failure due to blood clots within the coronary vessels, which in turn was due to the trauma and shock received due to this beating." The doctor further testified that decedent had a cut lip, a bruised swollen place on the left side of his forehead, a bruised swollen area on the left side of his chest, and that his nose was swollen and blood was coming from it.

Jesse L. Carr, an eminent pathologist of San Francisco, testified that he did not think this man had a spontaneous heart attack; that the disease as described by the autopsy surgeon was not sufficient for him to have died from a heart disease; and that except for the beating decedent would be alive.

Appellant Cayer argues that the most the evidence shows is involuntary manslaughter. He claims he could not legally be held for second degree murder because the attack on the decedent amounted to only an assault and battery, which is a misdemeanor and not a felony. Citing section 192 of the Penal Code, Cayer suggests that this court reduce the judgment to manslaughter. In this Cayer's argument would be controlling were it not for the fact that under section 192 the offense could not be manslaughter if there was "malice." Section 188 of the Penal Code provides that such malice (malice aforethought) may be express or implied; that it is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

In *People* v. *Bender*, 27 Cal.2d 164, 180 [163 P.2d 8], the court said:

" 'Murder,' says the Penal Code (§ 187), 'is the unlawful killing of a human being, with malice aforethought.'

"Thus 'malice aforethought' is made an essential element of the crime of murder whether it be of the first degree or of the *second* degree. 'Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (Pen. Code, § 188.)

" 'The words "malice" and "maliciously" import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law' (Pen. Code, § 7, subd. 4) but they do not, at least insofar as implied malice is concerned, require a preexisting hatred or enmity toward the individual injured."

Cayer relies mainly upon *People* v. *Munn*, 65 Cal. 211, 213 [3 P. 650], in which Munn's conviction of murder of the second degree for the death of the victim following a fist fight was reversed. But the court there said:

"If the means employed be not dangerous to life, or, in other words, if the blows causing death are inflicted with the fist, *and there are no aggravating circumstances,* the law will not raise the implication of malice aforethought, which must exist to make the crime murder. *The distinguishing characteristic respecting the two crimes of murder and manslaughter is malice.* Without the presence of this element of malice the

crime does not reach the higher degree of murder, but amounts simply to manslaughter." (Italics added.)

Cayer also cites *People* v. *Murat*, 45 Cal. 281, *People* v. *Denomme*, 6 Cal.Unrep. 227 [56 P. 98], *People* v. *Mullen*, 7 Cal.App. 547 [94 P. 867], *People* v. *Miller*, 114 Cal.App. 293 [299 P. 742], and *People* v. *Slater*, 60 Cal.App.2d 358 [140 P.2d 846]. But in the Murat case the verdict was guilty of an assault with a deadly weapon when no weapon was shown to have been used. In the Denomme case the defendant was found guilty of manslaughter only. In the Mullen case the charge was manslaughter; malice did not enter into the case. In the Miller case defendant was convicted of manslaughter only, and malice did not enter into it. In the Slater case the existence of or lack of malice was apparently not considered; also there was a vigorous dissent from the reduction of the degree of the crime to manslaughter.

The case before us is comparable to *People* v. *Tubby*, 34 Cal.2d 72 [207 P.2d 51]. There the degree of the offense was reduced to second degree murder, though the circumstances were more favorable to defendant than in the case before us.

Cayer seems to contend that a weapon of some kind is prerequisite to second degree murder, but the Tubby case dispels such theory.

*People* v. *Efstathiou*, 47 Cal.App.2d 441 [118 P.2d 22], decided by this court, is almost identical on the facts. The victim was the proprietor of a restaurant in Vallejo and defendant was employed as a cook. The proprietor and the cook got into an argument over the manner in which a steak was prepared and defendant was "fired." The proprietor left the restaurant and defendant ran after him. They met on the street and a fight ensued. There were no witnesses to the beginning of the encounter. Defendant testified that they exchanged blows with their fists and that he hit the victim and knocked him down. A witness testified that he saw appellant start to cross the street, then turn back to where the proprietor was lying and kick him. The victim died as a result of his injuries. A judgment of murder in the second degree was affirmed. Also see *People* v. *Alexander*, 62 Cal.App. 306, 308 [216 P. 968] (hearing in Supreme Court denied).

That Cayer acted with malice is evidenced by his own testimony that he thought deceased had told Miss McCrillis that he was drunk behind the bar, and that when he saw him

he "just went over and hit him." The statements made to the Marchellos, set forth above, are also evidence of malice.

### The Case Against Sunderland

■ Sunderland's first point urged for reversal is that there is no evidence of malice on his part. However, the record shows that several persons attempted to stop the fight but Sunderland prevented them. John P. Marchello testified that while Cayer was beating the deceased, Sunderland stood over them and said: "If any of you sons-of-bitches want the same thing, just come and step in."

Mildred Marchello testified that when she came in "Lloyd [Sunderland] was holding Jim [deceased] and Joe [Cayer] hit him"; that people spoke of stopping it but nobody stepped forward "because Lloyd [Sunderland] was standing there and he says, 'Any of the rest of you sons-of-bitches want any of this why step right up and get it.'"

Fred McMahon testified that both Cayer and Sunderland struck the deceased about the same time, when he first entered the room; that "I reached up and grabbed Joe [Cayer] around the neck and started to pull him off, and Lloyd [Sunderland] said, 'Lay off, if you don't want to get hurt,' and grabbed me and shoved me towards the door"; that he thought of getting the constable but remembered that the constable had gone to the fair at Quincy, so he came back in; that Sunderland stood right there and kept pushing the crowd back, and said, "Don't anybody step in if you don't want to get hurt"; that he heard Sunderland say they would beat him (the deceased) every day until he left the canyon; that he saw Sunderland kick at Bailey's shoulders or head but did not know if he connected.

Nestor A. Takala testified: "The first thing that caught my eye was the defendant Lloyd Sunderland. He seemed to be holding, holding the people back; holding the crowd back. . . . I had somewhat analyzed the situation and I then appealed to the other defendant Lloyd Sunderland, who I recognized as the manager of the Belden Resort bar. I appealed to him and said with these words: I said, 'Let's stop this fight.' Sunderland's answer to me was, with a shove at the same time, he said, 'Get away! This doesn't concern you.' I tried to reason with Sunderland. I says, 'But he's killing him.' Sunderland's answer to me was, 'Let him kill the son-of-a-bitch.'"

George A. Wess testified that Sunderland defied anybody to interfere and said, "Well, anybody else want the same thing?" May McMahon testified that Sunderland stood over the deceased and said: "I'll be in the county for ninety days. I'll beat you every day for ninety days until you're gone or I'm gone." Violet Kehlor testified that after the fight Sunderland asked her if she had heard what "they'd done to Jim Bailey"; she told him no. He said, "We kicked the shit out of the brown-nosed son-of-a-bitch." Ernest Wussow, *a defense witness,* testified that when he came in Sunderland said that if anyone else wanted to get in or butt in he would get some of the same—or something like that.

Jane McCrillis testified: "Yes, I heard Lloyd [Sunderland] say the same thing that Mrs. McMahon testified; that he would be in the county for ninety days and that he would beat Jimmie [decedent] every day of the ninety days, and I also said to, told Lloyd—I told him to get out and he said to 'make me.' ' "

Sunderland's conduct made him a principal. In *People* v. *Le Grant,* 76 Cal.App.2d 148, 154 [172 P.2d 554], in which the defendants were found guilty of manslaughter, the court said, regarding an asserted principal:

"Indeed, by his own statements, he gave active aid, encouragement and assistance to Vincent by taking such an affirmative part as to keep other people back who might have 'butted in' and have thus prevented the tragedy. By so doing he acted with full knowledge that an assault and battery was in progress, the reasonable and natural consequence of which might be a serious injury to, or possibly the death of, either or both of the combatants. Such a course of conduct on the part of Le Grant constituted an aiding and abetting of Vincent in the unlawful assault and battery and resulting homicide, thus making him also liable as a principal for the crime of involuntary manslaughter. [Numerous cases cited.] "

From the evidence in this case we are satisfied that Sunderland not only aided and abetted Cayer, but that he did so with malice.

■ His second contention is that the court erred in permitting an amendment of the information in his absence by changing the charge from manslaughter to murder. The motion to amend was heard in the presence of counsel for both Cayer and Sunderland who made no objection except "that the evidence presented at the preliminary hearing does not bear out the allegation of malice." Nothing was said by counsel about the absence of the defendants when the motion was made

and granted; and Sunderland pleaded to the amended information without objection. Section 1008 of the Penal Code provides for amending the information. Section 995 provides grounds for setting aside the information, and absence of a defendant is not a ground. Defendants' counsel was present when the amendment was made, and waived the presence of defendants.

Appellant cites no statute or case which provides that an amendment may be made only while a defendant is present. In fact, *People* v. *Garcia*, 2 Cal.2d 673, 680 [42 P.2d 1013], cited by Sunderland, contains language refuting his present claim.

■ The third point raised by Sunderland is that the district attorney was guilty of prejudicial misconduct in his final argument to the jury. The arguments have not been brought up. However, Sunderland in his opening brief admits that no objection was made to what he designates as "this prejudicial excursion outside the record." Furthermore, his point is lost by failure to demand that the argument be included in the record. (Rule 4(a) of Rules on Appeal.)

■ The fourth point made is that the court erred in failing to instruct the jury correctly and adequately. It is not claimed that Sunderland offered any instructions that were refused. The alleged error is that the court's instruction regarding involuntary manslaughter was erroneous. The instruction given was:

"Under the Information in this case, the defendants may, if the evidence warrant it, be convicted of manslaughter. This is defined by our statute to be the unlawful killing of a human being without malice, and is of two kinds:

"First, voluntary, upon a sudden quarrel or heat of passion; and second, involuntary, in the commission of an unlawful act which might produce death, in an unlawful manner or without due caution or circumspection."

This follows Penal Code, section 192. If appellant desired a fuller definition he should have presented a request therefor.

As is stated in *People* v. *Bender, supra,* at page 175:

"The general rule relating to the duty of the court in giving instructions in criminal cases is stated in *People* v. *Warren* (1940), 16 Cal.2d 103, 116-117 [104 P.2d 1024] : ' "It is the duty of a court in criminal cases to give, of its own motion, instructions on the general principles of law pertinent to such cases, where they are not proposed or presented in writing by the parties themselves. But it is not its duty to give

instructions upon specific points developed through the evidence introduced at the trial, unless such instructions are requested by the party desiring them. When the court fully and fairly charges the jury upon the law appertaining to the facts of the case, its failure to instruct on any particular matter deemed essential is not error in the absence of a request for such an instruction.'' (8 Cal.Jur. 309, and cases cited.)' ''

██ Sunderland's next alleged error is that while the jury was instructed to disregard testimony held to be inadmissible, it was not cautioned not to consider the admissions of Cayer in weighing the evidence against Sunderland. We find no admissions of Cayer that implicated Sunderland, so, as far as he is concerned, no such instruction was needed. At one point in the trial objection was made that a statement of Sunderland in the absence of Cayer should not be considered as against Cayer, and the jury was so instructed.

We find no reversible error in the record. Accordingly, the judgments and the orders denying new trials are affirmed as to both appellants.

Van Dyke, J., and Peek, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 3, 1951.