[Crim. No. 8130. In Bank. June 16, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JOYCE MARIE
FORBS, Defendant and Appellant.

Erling J. Hovden, Public Defender, John M. Moore and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Paul N. Wenger, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—Defendant was charged by information with the crime of murder; the jury found her guilty of voluntary manslaughter. The court sentenced her to the penitentiary for the term required by law.

For the reasons stated below we hold that defendant's conviction must be reversed because the police obtained incriminating statements from her at the accusatory stage without advising her of her rights to counsel and to remain silent, although the record fails to show that she otherwise waived those rights. We point out that the introduction of such statements worked prejudicial error. We further explain that although the evidence could not sustain a verdict of voluntary manslaughter in the absence of a showing of defendant's intention to kill, the issue of whether such erroneous verdict caused prejudice to defendant need not be resolved in view of our reversal. Finally, we do not accept defendant's contention that the trial court failed to give adequate instructions on the law of excusable homicide.

The victim was defendant's son, a child 2½ years old. The boy died on November 1, 1962. Defendant and her husband had separated subsequent to the boy's birth; defendant, after some dispute, gained custody of the child. On the date of death and immediately before that time she resided with her five children in a housing project in Los Angeles.

During the several weeks immediately preceding his death, the child suffered approximately 30 injuries or groups of injuries to various parts of his head and body. On the morning of November 2, 1962, a police officer, in response to a radio call, went to defendant's residence and asked about the child. Defendant identified herself to the officer and directed him to the upstairs bedroom where he found the deceased child lying on a bed. Defendant told the officer that the child had been ill; that she did not think that the illness required a doctor, but that suddenly the previous evening the child had died. Upon the officer's request for an explanation of the injuries to the child, defendant replied that when the boy had been outside to play the neighborhood children had inflicted the bruises.

The officer took defendant to the police station; she was

then questioned. She was placed in jail and on November 5th and 6th again interrogated. At the latter inquiry, which was recorded, defendant stated that, on or about October 24th, after she had taken her children, including the deceased child, out of a kitchen cabinet in which they were climbing, she left the kitchen. The victim followed her. She then suddenly turned around and struck the boy in the face or on the head with her right hand. The blow knocked him backward a few feet, causing his head to strike a table top. Due to the blow, he fell to the floor unconscious. After he had lain there for two or three minutes, defendant picked him up and put him on the couch. The child was still breathing. She then telephoned her mother and told her that she had hit the child and that he was hurt. Defendant indicated to the police that she had not called a doctor because she feared that he might report her. During the next few days the boy's physical condition began to deteriorate visibly; on November 1, 1962, he died. Defendant also stated that the whippings she had previously administered to the child had caused the scars.

The police first brought defendant before a magistrate after she gave her statement on November 6th. One of the officers present testified that so far as he knew defendant did not talk to an attorney at any time prior to or during the interrogations and that he did not recall having informed defendant of her right to counsel before the interrogation.

The failure of the police at the accusatory stage to advise an accused of his rights to counsel and to remain silent, in the absence of any evidence that he otherwise waived those rights, renders the admission of his incriminating statements erroneous. (*People* v. *Dorado* (1965) *ante,* p. 338 [42 Cal. Rptr. 169, 398 P.2d 361]; *People* v. *Stewart* (1965) *ante,* p. 571 [43 Cal.Rptr. 201, 400 P.2d 97]; *Russo* v. *New Jersey* (1965) —— F.2d ——; *Clifton* v. *United States* (1965) 341 F.2d 649; *Galarza Cruz* v. *Delgado* (1964) 233 F.Supp. 944; *State* v. *Dufour* (1965) —— R.I. —— [206 A.2d 82, 85]; *State* v. *Neely* (1965) —— Ore. —— [398 P.2d 482]; see *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].)

The accusatory stage, or that stage when one has a right to counsel, accrues "... when the officers have arrested the suspect and the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements. . . ." (*People* v. *Stewart* (1965) *ante,* pp. 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].) Since a defendant

has a right to counsel at that stage, we have held that he must be informed of that right or otherwise knowingly and intelligently waive it. (*People* v. *Dorado, supra, ante,* p. 338.)

When defendant made her incriminating statement on November 6 the accusatory stage had long since been reached. At that time she had been under arrest for four days without having been brought before a magistrate. (See Pen. Code, § 825.) The police had interrogated her several times while she was under detention. The police continually had urged her to discuss the events surrounding the death of the child. Under these circumstances, we do not doubt that at the time defendant gave the incriminating statements she was being subjected to a process of interrogations that lent itself to eliciting incriminating statements. (*People* v. *Stewart, supra, ante,* p. 571.) Since she had not been advised of her rights to counsel and to remain silent and since she did not otherwise waive those rights, the admission of her incriminating statements constituted error. (*People* v. *Dorado, supra, ante,* p. 338.)

Defendant requested an instruction, a portion of which stated that a confession does not become involuntary by the facts that at the time of its rendition defendant was under arrest, that she did not have an attorney and that she was not told that any statement could be used against her. Defendant's request for such an instruction does not induce the conclusion that here the erroneous admission of defendant's statement constituted invited error. Our decisions do not hold that the failure to advise a person of his rights during the accusatory stage renders a statement involuntary; we have said that under *Escobedo* the failure to give such advice in a situation such as the instant one renders the statement inadmissible, whether or not it was voluntary. Moreover, defendant's failure to object on the ground that the admission of the statements violated her rights established by *Escobedo* and *Dorado* does not constitute a waiver of those rights since the present trial occurred prior to the decision in those cases. (*People* v. *Hillery* (1965) *ante,* pp. 692, 711 [44 Cal.Rptr. 30, 401 P.2d 382].)

Even if defendant's incriminating statements do not constitute a confession that requires automatic reversal upon admission into evidence, such statements were so damaging to defendant that we cannot say that they caused only harmles error under article VI, section 4½ of the California Constitution. These statements were the only direct evidence as

to the circumstances surrounding the death of the victim. Certainly her admission that she had beaten the child on other occasions, and on the occasion in question, would weigh heavily with the jury. The contention that medical reports of injuries to the child and defendant's apparent dislike of the child constitute "overwhelming" evidence of defendant's guilt obviously cannot stand. Accordingly, the admission of the statements gravely prejudiced defendant and therefore compels reversal. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].)

In view of our holding that this erroneous admission of defendant's incriminating statements requires reversal, we need not discuss defendant's contention that the statements were involuntarily given and that the corpus delicti of the felonious homicide was not proven before the admission of the statements. Likewise, we do not discuss the prosecutor's comment on defendant's failure to testify at the trial since we reverse on other grounds. (See *Griffin* v. *California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].)

We turn to defendant's contention that the evidence did not support the verdict of voluntary manslaughter since the prosecution did not introduce any evidence that she intended to kill the child.

Penal Code section 192 defines voluntary manslaughter as "the unlawful killing of a human being, without malice ... upon a sudden quarrel or heat of passion." ■ It "is a wilful act, characterized by the presence of an intent to kill engendered by sufficient provocation and by the absence of premeditation, deliberation and (by presumption of law) malice aforethought." (*People* v. *Bridgehouse* (1956) 47 Cal.2d 406, 413 [303 P.2d 1018] ; see *People* v. *Miller* (1931) 114 Cal.App. 293, 300 [299 P. 742].)

■ The prosecution here introduced evidence bearing on the issues of second degree murder and involuntary manslaughter but did not attempt to prove that defendant intended to kill her child. Thus, the evidence did not sustain a verdict of voluntary manslaughter.

The Attorney General contends that defendant did not suffer prejudice by a conviction of voluntary manslaughter because the punishment is the same for voluntary manslaughter and involuntary manslaughter (see *People* v. *Jackson* (1962) 202 Cal.App.2d 179, 182 [20 Cal.Rptr. 592]) and because voluntary manslaughter is a lesser offense than second degree murder, the crime with which defendant was charged.

(See *People* v. *Powell* (1949) 34 Cal.2d 196, 205-208 [208 P.2d 974].)

Since we reverse on other grounds, however, we do not probe the issue of whether the erroneous verdict of voluntary manslaughter would be of such prejudice to defendant as to require reversal.

▮ Finally, we find no merit in defendant's contention that the trial court's failure to give full and adequate instructions on the law of excusable homicide constituted reversible error.

The defendant requested, and the trial court gave, the following instruction: "The killing of a human being is excusable and not unlawful . . . when committed by accident and misfortune in doing any lawful act by lawful means and without any unlawful intent and where the person causing the death acted with that care and caution which would be exercised by the ordinarily careful and prudent individual under like circumstances. . . . Excusable homicide is distinguished from felonious homicide in that to be excusable the killing of the human being must have been by both accident and misfortune. Even though the death was accidental and may not have been intended and was not anticipated, the homicide will not be excused if it was caused by an unlawful act, or by the doing of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (CALJIC No. 320 (old form).)

This instruction is based on section 195 of the Penal Code, which reads as follows: "Homicide is excusable in the following cases: 1. When committed by accident and misfortune, in lawfully correcting a child or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent. 2. When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner."

Defendant argues that since she relied solely on the defense that death resulted accidentally from the lawful correction of her son, the trial judge should have given an instruction based on that part of section 195 which excuses a homicide committed in the lawful correction of a child.

The instruction, however, explained that the "killing of

854

a human being is excusable and not unlawful ... when committed ... in doing any lawful act by lawful means and without any unlawful intent. ..." Such broad language sufficiently encompasses the act of lawful correction of a child. That a more specific instruction could have been given does not constitute error if the defendant does not request such an instruction and, in fact, as here, asks for the more general instruction. (See *People* v. *Reed* (1952) 38 Cal.2d 423, 430 [240 P.2d 590] ; *People* v. *Meichtry* (1951) 37 Cal.2d 385, 389-390 [231 P.2d 847] ; *People* v. *Byrnes* (1866) 30 Cal. 206 ; *People* v. *Shepherd* (1963) 223 Cal.App.2d 166, 172-173 [35 Cal.Rptr. 497].)

The conviction cannot stand in view of the erroneous and prejudicial admission of defendant's incriminating statements.

The judgment is reversed.

Traynor, C. J., Peters, J., Peek, J., and Dooling, J.,* concurred.

SCHAUER, J.,* Dissenting.—As I read the record in this case the evidence relied upon by the majority relative to admissions or confessions of facts by defendant is, in perspective of the entire record, inconsequential. Upon undisputed evidence from independent sources it is difficult to perceive how any verdict other than of guilt could reasonably have been reached by impartial factfinders. Accordingly the error declared by the majority cannot properly support a finding that the verdict which was rendered works a miscarriage of justice against defendant. The judgment should be affirmed.

To present in focus the essential facts the following passages are quoted from the majority opinion :

"The victim was defendant's son, a child 2½ years old. The boy died on November 1, 1962. ...

"During the several weeks immediately preceding his death, the child suffered approximately 30 injuries or groups of injuries to various parts of his head and body. On the morning of November 2, 1962, a police officer, in response to a radio call, went to defendant's residence and asked about the child. Defendant identified herself to the officer and directed him to the upstairs bedroom where he found the de-

ceased child lying on a bed. Defendant told the officer that
the child had been ill; that she did not think that the illness
required a doctor, but that suddenly the previous evening
the child had died. Upon the officer's request for an explana-
tion of the injuries to the child, defendant replied that when
the boy had been outside to play, the neighborhood children
had inflicted the bruises.''

None of the above related facts can be said to have been
procured by improper police conduct. It is undisputed that
the deceased child was at all times concerned in the custody
of his mother and that medical services were available to her
without cost. The investigation of the child's death had not
reached an accusatory stage when the officer requested an
explanation of the obvious injuries to his body. Furthermore,
the following evidence comes from an independent and un-
impeached witness (Dr. Kenneth Chapman, M.D., a medical
examiner for the Los Angeles County Coroner's Office) and
unequivocally establishes the cause of the 2½-year-old child's
death, and the callous neglect of his mother preceding his
death. Such evidence from Dr. Chapman is ample to show
that defendant was at least less than truthful and was con-
scious of guilt in respect to the death of her child.

Dr. Chapman established his qualifications as a skilled
medical expert. He testified that he had performed over 3,000
autopsies and from one performed on defendant's dead child
his findings were: ''[T]he cause of death was a subacute,
subdural hematoma, which is a hemorrhage caused by trauma
producing blood between the brain and the brain coverings,
which produces a pressure on the brain.''

''By ''trauma'' he meant ''An external force, in this case
a blow to the head.... [T]he cause of the hemorrhage was a
blow to the head. There was also evidence of other traumatic
injuries. . . . [The injury was] On the back of the head,
there was a bruise of the scalp about 2½ by 2¼ inches in size
with hemorrhage into the scalp tissues and accumulation of
blood clots in the scalp tissues itself.''

Questions and answers then continue:

''Q. Could you determine from your examination how old
this bruise was? A. Only roughly.

''Q. What was your determination? A. It was on the order
of one to three weeks.

''Q. Did you examine the entire body of this child? A. Yes.

''Q. Did you find anything else besides this particular
bruise on the back of the head?

856

"A. Yes. There were numerous abrasions on the body surface, most of them crusted showing that they were a matter of days, at least, old. There were areas of bruising and there were numerous small scars and some flat scars up to 2 by 2 inches in size. . . . I made a list of them. . . . On the back of the head, there is a bruise I described, which I measured 2½ by 2¼ inches in greatest dimensions. On the surface over this area, there were two abrasions of the skin, one on the right side was 7/16 by ⅜ of an inch and one on the left side was the same dimensions. . . . [T]he back of the head was the location of the bruise (indicating), and on each side of the midline, there was a small abrasion of the skin over the bruised area (indicating). On the left parietal scalp directly above the ear, that would be this portion of the scalp (indicating), there was an abrasion 2 inches by ⅞ of an inch in greatest dimensions, which showed crusting of the surface and the left parietal occipital region, which is the left side of the head (indicating). Further toward the back, there was an area of swelling of the scalp with an abrasion overlying a ¼ by 3/16 of an inch in size. On the right parietal scalp directly above the ear, which would be in this location (indicating), on the right parietal scalp, there was an area of abrasion 7/16 by 5/16 of an inch in size. There were additional smaller crusted abrasions on the forehead and the right cheek.

"There was a swelling of the left upper eyelid which did not show any discoloration. There was no evidence of injury to the eyeballs.

"There were numerous small scars on the scalp and the face, the largest was 1½ by ⅜ of an inch in size located in the midline of the posterior parietal region—rather, it was left of the midline approximately in this location (indicating).

"There were crusted abrasions on the pinna of both ears. There was a ⅜ inch crusted abrasion on the under surface of the chin. The under surface of the jaw and both sides of the neck in front and on the sides showed many areas of ecchymotic discoloration, which is to say discoloration resembling that of a bruise, having a mottled distribution. Similar areas of the mottled bruising were found on the front of the chest and the back of the chest, the abdomen and the right and left lateral aspects of the chest and the right and left flanks. A similar area of mottled bruising was found on the abdomen just above the pubic region and also on both thighs in front and near the genital region.

"There were scattered small scars a quarter to half inch

in size over the front and left side of the chest. There was a flat scar 1⅜ by ⅜ of an inch in size on the right lower chest in the back.

"The posterior sacro-iliac region, which is the back of the trunk region, showed multiple scars ranging from a quarter to an inch in greatest dimensions. The left arm between the elbow and the shoulder in front and on the side showed scars which measured 1¼, 1½ and 1 inch in greatest dimensions. There were smaller scars on the back of the right forearm. On the left arm anteriorly just above the elbow, there was an area of avulsion of the skin, which means loss of skin surface, which was ⅞ by 5/16 of an inch in size. This appeared somewhat old, having the appearance of an abrasion from which the scab had been torn off.

"On the back of the left forearm, there was a crusted abrasion an inch and a quarter by an inch and—excuse me— an inch and a quarter by an eighth of an inch in size. There were additional smaller areas of scarring and crusted abrasions.

"On the left buttocks, there was a dark gray brown area of bruising an inch and a quarter by ⅜ of an inch in size. On the right ankle anteriorly, there was a scar which was an inch and three quarters by ⅞ of an inch in size. The left ankle and the foot showed swelling with discoloration by bruising. Both feet were somewhat swollen and the upper and lower lips were moderately swollen and the lower lips showed an increase of firmness, which would indicate some scarring of the tissues underneath the skin. . . . The left and ninth rib (indicating) toward the back showed a healed fractured callus. A fluoroscopic examination of the entire body was done and there was no other evidence of bone injury.

"Q. When you say callus, what does that mean? A. That is the bone formation that occurs at the site of a healed fracture.

"There was a bruise of the bladder in front and there was a bruising of the left psoas muscle, which is a muscle in the trunk region that is attached to the pelvis and the thigh. It is located toward the back of the body.

"Q. Now these are internal bruises? A. Yes.

"Q. Inside of the body? A. Yes.

"There was evidence that some blood had been aspirated into the lungs, and microscopic examination confirmed that and showed that there was a pneumonia developing at the location of the aspirated blood.

"On reflecting the scalp, the bruise at the back of the head, which I previously mentioned, was noted. The scalp was thickened and there was a collection of blood within the scalp a quarter of an inch in thickness. This bruising extended onto the right side, posterior, to the ear. There was additional bruising on the under surface of the scalp on the left side in the frontal partietal [*sic*] region, which would be about here (indicating). There was no skull fracture.

"Opening the brain cavity, we found a hemorrhage which was subdural, which means located between the surface of the brain and the dura, which is a membrane that is attached to the skull. This was located on both sides of the brain and on the sides and underneath the brain. This hemorrhage was estimated at 100 cc's, which would be about 3 to 3½ fluid ounces. It showed a neomembrane, which would indicate passing of time, the result of an early attempt at healing of the injury.

"Q. You mean when you say healing, do you mean by medical treatment of the body or by the body? A. No, I mean the body reaction to the presence of the blood clot.

"On microscopic examination, my estimate of the age would be two to three weeks.

"Q. Referring to the injury to the head? A. Of this blood clot.

"Q. Now did you find any evidence of any medical treatment? A. No, I didn't.

"Q. Now this particular injury to the head which caused death, was it of such a nature that it could have responded to medical treatment? Do you have an opinion concerning this? A. Yes.

"Q. What is that opinion? A. A blood clot, a subdural blood clot can be removed surgically."

It may also be mentioned that the witness Fannie Sullivan, who sometimes visited and sometimes did babysitting for defendant, testified that on November 1, 1962, the day of the child Bubba's death, she was at the defendant's home; that she arrived "About 12:00 o'clock" and "stayed there until ... about 4:00 o'clock ... in the afternoon;" that she did not see Bubba that day. The witness, under questioning continued:

"Q. On November 1st, did Joyce [defendant] tell you anything about Bubba? A. She told me that she didn't like the baby on account of his dad.... And then she told me

she had him tied in the bed and she said she was tying him to keep him from pulling her food out of the refrigerator box.

"Q. Did she say that on November 1st? A. November the 1st.

"Q. Now when you say tied, you mean tied with a string or rope? A. Yes, with a string.

"Q. Did she say where he was tied, where in what room? A. He was in the room, the second room.

"Q. Now what kind of a place is that that Joyce lives in, is it one-story or two-stories? A. Two-stories.

"Q. You were staying at her home on the first story, is that it, you were on the ground floor? A. Yes.

"Q. Did you go upstairs that day? A. No, I didn't. She told me to stay downstairs and keep the children from going up there, that Bubba was up there asleep and to keep the children from going up there and waking him up.

"Q. Did she tell you anything else? A. No.

". . . . . . . . . . .

"Q. Now you saw Bubba on October 1st? A. October 1st.

"Q. Did you see the defendant, Joyce Forbs, do anything to Bubba on that day? A. No, not on that day.

"One day I was up there, she hit him with the broom, that is all I seed her do to him.

". . . . . . . . . . .

"Q. When was it that you saw her hit Bubba with the broom? A. That was the same day I babysat for her but she didn't hit him very hard with the broom.

"Q. Was it the first time you babysat or the second time? A. That was the first time.

"Q. That would be October 1st then? A. Yes.

"Q. Did she hit him one time or more than one time? A. Just one time.

"Q. What portion of his body did she hit with the broom? A. On the head.

"Q. Did you say anything to her or did she say anything to you? A. Yes, I told her—I told her, 'Joyce, I wouldn't do that.' She said, 'I don't like the baby because I don't like his dad.'

"Q. That was after she had hit him on the head? A. Yes."

In my view the evidence above set forth fully supports a finding that defendant was guilty of murder in the second degree. There would have been no reasonable basis for holding that a verdict of second degree murder could constitute a miscarriage of justice. That the jury wished to be lenient

and ameliorate the penalty to that for voluntary manslaughter should not be made the basis for a reversal of the conviction.

In view of the overwhelming independent evidence of defendant's guilt, the fact that it was also cumulatively shown that she made some admissions or confessions of facts should not be magnified out of reasonable proportion to any logical effect upon the verdict. In this connection it is to be noted that the defendant requested and the court gave the following instruction:

"A confession is involuntary when it is obtained by any sort of violence or threats, or by any direct or implied promises of immunity or benefit, or by any improper influence which might induce in the mind of the defendant the belief or hope that he would gain or benefit or be better off by making a statement, and when the defendant makes such confession as the result of any such inducement originating with a law enforcement officer. But, even though a confession is made under a hope or belief of benefit, it will not be involuntary if such hope or benefit originated in the mind of the defendant solely, or was induced solely by the advice or counsel of a relative, attorney, or other person not connected with law enforcement.

"The fact that a defendant was under arrest at the time he made a confession or that he was not at the time represented by counsel or that he was not told that any statement he might make could or would be used against him or that he was told that others had made statements implicating him in the crime, will not render such confession involuntary.

"Where there is a conflict in the evidence, it is for the jury to decide whether the confession was made voluntarily or involuntarily, and in making this determination the jury should govern its action by the same rules as to weighing the evidence and credibility of witnesses as apply to the determination of any of the issues in the case."

If it was error to give the quoted instruction it was error invited by defendant and, in any event, because of the independent overwhelming evidence of her guilt, does not establish a basis for reversing the judgment.

In the circumstances no miscarriage of justice adverse to defendant appears. (See Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 834-838 [299 P.2d 243].)

I would affirm the judgment.

McComb, J., concurred.