[Crim. No. 23790. Second Dist., Div. Two. Apr. 23, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES EDWARD STANDIFER et al., Defendants and Appellants.

[Crim. No. 24951. Second Dist., Div. Two. Apr. 23, 1974.]

In re JAMES STANDIFER et al. on Habeas Corpus.

**COUNSEL**

Sharon E. Giannetta and John J. Schimmenti for Defendants and Appellants and for Petitioners.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent and for Respondent.

**OPINION**

**ROTH, P. J.**—Appellant-petitioners (appellants), James Edward Standifer (Standifer) and Maurice Bernard Nicholas (Nicholas) appeal from judgments following a jury trial by which they were respectively found guilty of murder in the second degree and murder in the first degree. (Pen. Code, § 189). Pending their appeal appellants petitioned the Supreme Court for writ of habeas corpus and by order of March 7, 1974, of said court, the petition was transferred to and filed in this court as Crim. 24951. The appeal and the petition are treated herein separately.

## Facts — Generally

On the evening of November 20, 1972, Ruth Chisom, her common law husband Leonard Harris, Pamela Palmer, her boyfriend Edward Green, Jr., (victim), and Michael Faulk, were socializing at the residence of Palmer on East 46th Street in Los Angeles. The Palmer residence is in the rear of another dwelling and is set back approximately 90 feet from 46th Street. Nicholas, a brother of Palmer, lived part of the time at her residence and part of the time at the residence on 43rd Street of another sister, Janice Burns. At approximately 10 p.m. appellants, without knocking, walked into the Palmer residence. Leonard Harris was asleep on Ruth Chisom's lap, the victim Green was lying across a couch in another part of the front room, and Faulk and Palmer were in the bedroom talking. Standifer walked across the front room to the doorway of the kitchen and stood there. Nicholas strode toward the victim, kicked his foot, and ordered him outside. The victim protested briefly but proceeded to exit as ordered followed closely by Nicholas. As they proceeded outside Chisom noticed Nicholas holding a revolver in the small of his back. She asked Standifer if Nicholas intended to shoot the victim. After the departure of Nicholas and the victim, three shots were heard. Harris, awakened by the shots, jumped up. Standifer pointed a .25 automatic pistol at him and ordered him to cool it and sit down; proceeded to search Harris for a weapon and, thinking that Chisom might be armed, dumped the contents of her purse on the couch.

Standifer would not permit any of the persons assembled in the Palmer residence to leave. Within minutes after the shooting, Nicholas returned breathless and excited. He told everyone to put on their coats because they were all going for a ride. Palmer came out of the bedroom and ran for the front door. Nicholas grabbed her as she was halfway out, jerked her back, and ordered her to sit down.

Chisom attempted to speak to Nicholas who refused to talk. She then approached Standifer and both went into the kitchen. She asked Standifer what was the big beef with the victim. He told her that he had heard one of three men who stopped Nicholas and himself before they entered the Palmer residence tell Nicholas that the victim had passed a phony $20 bill to the "Crypts"; they wanted their money, and asked Nicholas to persuade the victim to come out of the house. He assured Chisom that he and Nicholas had no "beef" with her or Harris. Meanwhile Harris succeeded in engaging Nicholas in conversation and Nicholas stated that the victim had passed a phony $20 bill to the "Crypts" and as soon as the victim returned everyone could go home. Later Chisom stated to Nicholas ". . . I seen what happened. I seen you go out the door, you know," and she also told him that she knew he had shot Edward (the victim). Nicholas made no answer. Shortly thereafter Chisom got sick and walked toward the bathroom. Standifer intercepted her and told her she could use it but not to close the door. At approximately 1 a.m. Nicholas left. No one else was permitted to leave. Standifer, with the phone in his lap which he would not permit anyone to use, stayed until 7 a.m. He then left and the others followed.

Henry Albert McRuffin, a witness who lived across the street a distance of approximately five houses east of the Palmer residence, testified that at approximately 10 p.m. of that day he arrived at his residence and as he got out of his car he heard what sounded like two firecrackers. Concurrently he saw two men, one in chase of the other, running fast out of the driveway across the street. When they reached 46th Street they turned west toward Compton Avenue and, as they traversed a distance of approximately four houses, he heard what sounded like four more shots. Briefly he lost sight of the two men and then saw that the one who had been doing the chasing stopped, paused for a second near a parked Mustang, and proceeded west towards Compton Avenue. Later that evening he observed the victim's body lying in the street in the same area that the other person had paused. The location of the body was approximately 75 yards from the Palmer residence. Subsequent examination disclosed that the victim had been shot once in the back, once in the ear, and that he might have been grazed by two more bullets. The shot in the back severed the spinal cord and would have caused instant paralysis but was nonfatal. The bullet in the ear appeared to have been fired from a distance no greater than six inches and was fatal. Both bullets were fired from a Smith & Wesson .38 caliber revolver.

David J. Lees, a Los Angeles Police Department detective, arrived at the scene at approximately 11:30 p.m. and saw the body in the street

within 15 feet of a parked Mustang. In the back seat of the Mustang was a holster for a .38 caliber revolver and a black leather belt. The Mustang belonged to Janice Burns, the other sister of Nicholas who had loaned it to Nicholas earlier that evening. After Nicholas borrowed the Mustang he drove to Century City to pick up Standifer, who had had trouble with his car, at approximately 7 p.m. The two men used the Mustang until they arrived at the Palmer residence at approximately 10 p.m.

After Nicholas left the Palmer residence at 1 a.m. a neighbor to the west of the Palmer residence called the police to report a man prowling in his yard. The police, aware of the homicide, responded immediately. When they arrived they saw Nicholas exiting from the front steps of the house where the prowler had been reported. Nicholas was arrested and searched. In one of his pockets they found a .38 caliber shell casing. The .38 caliber revolver was never found.

When Standifer left the Palmer residence he went to the residence of Eileen Foster. He arrived between 8 to 9 a.m. He testified he asked her to keep a gun for him. (She later, under circumstances detailed *infra,* delivered the weapon to the police.) The gun was a .25 caliber automatic.

### Standifer's Version

Standifer explained his presence in the Palmer residence by the fact that Palmer was a sister of Nicholas and he had visited there on prior occasions with Nicholas, who resided there part of the time, and that Nicholas wanted to change his clothes; he said that before he and Nicholas entered they were met by three persons who had a conversation with Nicholas and he heard one of them tell Nicholas to bring the victim outside. He did tell Chisom after the shots were heard that the guys outside had said that the victim owed them $20 for a phony bill. He didn't know Nicholas intended to order the victim outside; or that Nicholas had any animosity toward the victim; he was a friend of the victim and knew him for 10 years, he said Nicholas "tapped" Green and ordered him outside; he did not see a gun in Nicholas' hands; he did nothing to encourage the victim to follow Nicholas' order; he did not know Nicholas was a member of the Crypts or that the gang was hostile to the victim and he did not see anything that transpired outside the Palmer residence. He was armed with a .25 automatic when he entered the Palmer residence with Nicholas because he had taken the automatic from his car when he was picked up by Nicholas in Century City; he was afraid it would be stolen if it were left in his car. He remained inside the Palmer residence after Green was escorted outside; after the shots were heard he did quiet and search Harris

and Chisom at the point of a .25 automatic because he was excited and thought Harris was rushing him; he did order Ruth Chisom to empty her purse on the couch; he did not search Palmer because he knew her; he denied he held Chisom, Harris and Faulk captive in the house, although he admitted Chisom thought so and he admitted that he permitted no one else to use the phone because he was expecting a call from Wade Foster, and monitored the phone until 7 a.m. when he left. He testified that Nicholas, when he reentered the house after the shooting, was excited and breathless and told everyone they could leave because Nicholas wanted Palmer and her child to get somewhere where they would be safe, but it was discovered that Palmer and her child could not leave because the keys to the victim's car were in the victim's pocket. He admitted that he refused to permit Chisom to close the door when she started to use the bathroom.

### Nicholas' Version

Nicholas testified he had two residences, one with his sister from whom he borrowed the Mustang, Janice Burns on 43rd Street, and the other with his sister Pamela on 46th Street. On November 20, 1972, he picked up Standifer in his sister's Mustang at around 7 p.m. in Century City; he did not have a gun that evening. Standifer took his gun with the holster out of the trunk of his car, which had broken down, and placed them on the floor of the Mustang. They drove to Wade Foster's house; they left Mr. Foster's house about 10 p.m. or 10:30 p.m. and walked to Palmer's residence through the alley. As they neared the Palmer residence, three men approached and asked them where "Lite" was. He did not know they were referring to the victim until they described Green; he told them Green was at his sister's house; one of the men asked him to have Green step out because he had given him a counterfeit $20 bill, and they wanted to get the money. Nicholas entered the house and told the victim someone wanted to see him outside; Green went outside, and as Nicholas was closing the door, he turned around to see what was happening; he could see Green knew the men; he heard a shot; he turned, tripped, recovered, and opened the door and went back in. He was out of the house approximately one minute. Before he reentered the house he saw the two men take off running. He knew Green was in the front because he had on a leather jacket. He was excited and angry because he felt that he had been tricked; he was very shaken, and he told everyone that they must leave; he wanted to get his sister and nephew to somewhere where they would be safe. He changed his mind about leaving because he decided it would look like he was running from something he did not do, and he believed that the police would be there shortly. He left Palmer's residence after

the shooting to return the Mustang to his other sister. He saw a shell casing in the driveway as he was leaving, so he picked it up; he saw a policeman taking a statement, so he put the shell casing into his pocket; he was on parole and he did not want to have any association with anybody that might result in the revocation of his parole. As he went toward the Mustang, he saw police officers preparing to tow it away and he did not approach any further because he thought he would be hassled by the police.

### Sufficiency of the Evidence

McRuffin testified to the chase in which two men were involved and the actual shooting. He did not, nor did any other witness, identify the person who did the shooting. A defense witness, William George Winston, also testified he saw three men, one of whom was armed, at about the time of the shooting. There is no direct evidence that either appellant was a member of the Crypts. No witness saw more than three men in the neighborhood of the Palmer residence at any time immediately before, during, or after the shooting. Appellants' defense on the facts was that neither of them had a motive and that someone else did the shooting.

The foregoing résumé of the evidence has been edited only to make clear the sequence of events and the circumstances under which the victim was murdered.

■ It would appear that any casual reader could conclude that the testimony detailed above weaves a tight web of circumstantial evidence, cogent and convincing, which would be amply sufficient to convince a jury beyond a reasonable doubt, as it did at bench, that appellants were guilty.

The evidence was sufficient in all respects to meet the requirements of a first degree murder conviction as to Nicholas. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].) In respect of Standifer, there was ample substantial evidence to permit the jury to infer beyond a reasonable doubt that Standifer had aided and abetted Nicholas with knowledge of Nicholas' wrongful purpose. (*People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Cayer* (1951) 102 Cal.App.2d 643 [228 P.2d 70].) The jury having decided that appellants were guilty of murder, it is clear that the members thereof were convinced beyond a reasonable doubt that they committed the crime. Their contention that the evidence can be reconciled with their defense of no-involvement was rejected by the jury as noncredible in view of all the other circumstances. We cannot and would not substitute our

analysis. (*People* v. *Newland* (1940) 15 Cal.2d 678 [104 P.2d 778].) █ This court does not reweigh the evidence. "The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt." (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].)

## The Nicholas Appeal

█ Nicholas argues that statements made by Standifer to Chisom that the victim was having trouble with the Crypts in respect of a $20 bill should have been excluded or, in the alternative, he should have been granted a separate trial. (*People* v. *Aranda* (1965) 63 Cal.2d 518, 528-531 [47 Cal.Rptr. 353, 407 P.2d 265]; see also *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].) *Aranda* applies to statements which implicate a codefendant. Nothing in the Chisom statement to Standifer implicated Nicholas and if there had been such implication Nicholas' rights of cross-examination and confrontation were satisfied since Standifer took the stand and was actually subjected to cross-examination by Nicholas. (*Nelson* v. *O'Neil* (1971) 402 U.S. 622 [29 L.Ed.2d 222, 91 S.Ct. 1723]; *People* v. *Jenkins* (1973) 34 Cal.App.3d 893, 896-898 [110 Cal.Rptr. 465].)

(4) Nicholas argues the trial court erred because it did not instruct the jury on the lesser included offense of manslaughter. There was no suggestion at any time during the trial that the defense was other than an execution of the victim by the Crypts. Nicholas testified he was not connected with the killing; he asserted it was done by three men who had asked him to tell the victim they wanted to see him. There was no evidence that the killing had been done in the "heat of passion" or as the result of a "sudden quarrel." A bullet fired into the ear from a distance of less than six inches could not conceivably support a conviction of manslaughter under the circumstances at bench. There was no error in refusing the instruction. (*People* v. *Duren* (1973) 9 Cal.3d 218, 236-237 [107 Cal.Rptr. 157, 507 P.2d 1365]; *People* v. *Gaulden* (1974) 36 Cal.App.3d 942 [111 Cal.Rptr. 803].)

█ Nicholas charges that the trial court erroneously permitted his impeachment by prior inconsistent statements he made to police officers shortly after his arrest. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) The record refutes the charge. The prosecutor, out of the presence of the jury, offered to show that proper *Miranda* warnings had been given and that Nicholas had signed a waiver of his rights under *Miranda.* No objection was made for obvious

tactical reasons. It may not be raised for the first time on appeal. (*In re Dennis M.* (1969) 70 Cal.2d 444, 462 [75 Cal.Rptr. 1, 450 P.2d 296].)

In a supplemental brief, Nicholas argues that the prosecution deliberately withheld evidence material to his defense. The prosecution indicated at the trial that the statements made to Ruth Chisom by both appellants were to be introduced. When both defense counsel stated that prior to trial the prosecutor had said that there were no statements, the prosecutor answered that he had understood that they were talking about written statements. There were in fact no written statements. Nicholas, citing *In re Ferguson* (1971) 5 Cal.3d 525 [96 Cal.Rptr. 594, 487 P.2d 1234], asserts the prosecution suppressed material favorable to the defense and this was prejudicial error per se. Assuming error, it was nonprejudicial since the Chisom statements denied by both appellants were not incriminatory. We note, however, that we do not approve of nice distinctions or gamemanship by the prosecution in discovery proceedings, be they formal or informal. ■ Much judicial time may be saved by informal discovery and the fact that strict formal procedure is not used by defense counsel should not be used as a pretext to prevent a defendant from obtaining all available evidence to which he is entitled, or to impair in any respect a defendant's right to a fair trial.

We have examined the other contentions raised by Nicholas and find them to be without merit.

### The Appeal of Standifer

■ Standifer's first contention is that the court incorrectly instructed the jury on "aiding and abetting" (Pen. Code, § 31), giving a modified version of CALJIC Instructions Nos. 3.00 and 3.01.[1] He argues that by removing the word "criminal" and substituting the word "required" the court did not adequately advise the jury that in order to convict Standifer it must find that he had the same criminal intent as the person who did the shooting. ■ All that is required to convict a person of "aiding and abetting" is that he aid and abet with knowledge of the wrongful purpose of the perpetrator of the crime. Prior case law has tended to be inconsistent in interpreting the requirements for aiding and abetting. (See,

---

[1] "All persons concerned in the commission of a crime who either directly and actively commit the act constituting the offense or who knowingly and with the required intent aid and abet in its commission, whether present or not, are regarded by the law as principals in the crime thus committed and are equally guilty thereof.

"A person aids and abets the commission of a crime if he knowingly and with the required intent aids, promotes, encourages or instigates by act or advice, or by act and advice, the commission of such crime."

e.g., *People* v. *Vasquez* (1972) 29 Cal.App.3d 81 [105 Cal.Rptr. 181] [same intent as that required for the crime itself]; *People* v. *Herrera* (1970) 6 Cal.App.3d 846 [86 Cal.Rptr. 165] [aids with knowledge of the perpetrator's criminal intent]; *People* v. *Butts* (1965) 236 Cal.App.2d 817 [46 Cal.Rptr. 362] [aiding plus sharing the same criminal intent]; *People* v. *Villa* (1957) 156 Cal.App.2d 128 [318 P.2d 828 [must share the criminal intent]; *People* v. *Wood* (1922) 56 Cal.App. 431 [205 P. 698] [aiding with knowledge of the other person's criminal intent].) In a factual situation where the aider and abettor is not present at the scene of the crime, assuming arguendo Standifer was not present, we feel the test is "did the defendant aid and abet the perpetrator with knowledge of the perpetrator's criminal intent." (See *People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961].)

In addition to the instructions complained of (see fn. 1, *supra*) and by the request of both appellants, the court gave the following instruction: "Mere presence at the scene and failure to take steps to prevent a crime do not establish aiding and abetting; the proof must show not only aiding the actor but also sharing the required intent."

The court also instructed that the required intent was the intent to kill, and made it clear to the jury that Standifer had to have the same intent as Nicholas. The instructions gave Standifer more than he was legally entitled to. The only intent the jury was obligated to find in respect of Standifer was his intention to knowingly aid Nicholas in the commission of a felony.

Appellant also argues that the instructions were fatal since they did not instruct the jury that the intent to aid had to be before the perpetration of the homicide. The instructions speak in terms of aiding and abetting in the commission of the crime. Obviously they cannot have reference to a point of time after the crime has been committed, and they are not subject to the infirmity charged.

Standifer also contends that the court erred in failing to give manslaughter instructions. He argues that the jury must have felt that Standifer was not as guilty as Nicholas and that, although he was guilty of something, it was less than first degree murder and that the jury might well have convicted him of manslaughter instead of second degree murder had it been given the chance. Our attention has been called to no part of the record, and we find none, which would support a manslaughter instruction. There was no error. (*People* v. *Rhinehart* (1973) 9 Cal.3d 139, 154 [107 Cal.Rptr. 34, 507 P.2d 642].)

## The Petition for Habeas Corpus

The petition, with numerous exhibits attached, charges Nicholas' counsel with incompetency in that he (1) failed to attack the composition of the jury or present evidence of community problems; (2) allowed without objection evidence obtained in violation of *Halpin* v. *Superior Court* (1972) 6 Cal.3d 885 [101 Cal.Rptr. 375, 495 P.2d 1295] and (3) failed to adequately consult with Nicholas. In addition, it alleges that the trial court did not consider letters written by Nicholas to the trial judge charging such incompetency pending hearing of a new trial motion.

The charge against the trial judge will be considered first. Exhibit M-5 to the petition reflects that on August 15, 1973, the trial court entered a detailed ex parte order which demonstrates that the court did consider the letters and found the charge untenable. (Compare *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].)

■ Competency of counsel has been divided into two areas: competency in the sense of strategy, tactics and judgment during the trial of the case; and lack of competence due to lack of knowledge of the law or lack of preparation and investigation. (*People* v. *Kirchner* (1965) 233 Cal.App. 2d 83 [43 Cal.Rptr. 218].) It is well settled that a judgment will not be disturbed on the ground of ineffective assistance of counsel unless the showing is such that counsel's incompetency reduced the trial to a farce and a sham. (*People* v. *Ibarra* (1963) 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487]; *In re Hawley* (1967) 67 Cal.2d 824 [63 Cal.Rptr. 831, 433 P.2d 919].)

Exhibits C-1 and C-2 attached to the petition comprising letters from Nicholas' counsel to Nicholas note many of the complaints of and suggestions made by Nicholas during the trial. These letters, when read in the light of the petition and the record on appeal, show that the attorney for Nicholas was thoroughly aware of and alert to every step of the proceedings and performed in a thoroughly competent manner.

■ Jurors for the central district of the court in Los Angeles County are selected from citizens throughout the county. (*Adams* v. *Superior Court* (1972) 27 Cal.App.3d 719 [104 Cal.Rptr. 144].) Petitioners argue, nonetheless, that an all white jury violates their right to a fair trial and that counsel's failure to object to trial before such a jury shows incompetency. A defendant, however, has no right to have any particular ethnic class sit as a jury in his case. (*Swain* v. *Alabama* (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824].)

The evidence showed that Standifer had given his automatic to Eileen Foster the morning after the killing. Later that same day her husband called, apparently as he was being booked into jail. She told him about the pistol. A police officer, listening to the conversation, interrupted and told her to hold the weapon and it was thereafter picked·up by the police. Petitioners complain of the competency of Nicholas' counsel because he did not move to suppress the weapon (Pen. Code, § 1538.5), and his failure to object to its introduction as evidence, contending it was obtained in violation of *Halpin* v. *Superior Court* (1972) 6 Cal.3d 885 [101 Cal.Rptr. 375, 495 P.2d 1295]. No allegation is made by petitioners that Wade Foster did not know of or consent to the listening in of the police. Title 18 United States Code section 2511, subdivision (2), subsections (c) and (d) provide exceptions to the application of the wiretap provisions of title III of the Omnibus Crime Control and Safe Streets Act. (18 U.S. C. §§ 2510-2520). The exceptions provide that if consent is given by one of the parties to the communication the chapter does not apply. Petitioners must allege with particularity facts which entitle them to relief. (*In re Shipp* (1965) 62 Cal.2d 547 [43 Cal.Rptr. 3, 399 P.2d 571].) When counsel is charged with incompetency the burden is upon the petitioner to aver facts, not make a charge which is speculative in nature. (*People* v. *Stephenson* (1974) 10 Cal.3d 652 [111 Cal.Rptr. 556, 517 P.2d 820].) Petitioners argue that the burden is upon the People to show that there was consent.[2] The argument is without merit.

Petitioners argue at length that Nicholas' counsel was unprepared because of lack of adequate consultation with Nicholas and aver that his counsel conferred with him for approximately one hour during preparation for trial and that the meagerness of the time resulted in failure: (1) to find Michael Faulk; (2) to talk to Mrs. Palmer and establish the fact that the police had been called earlier in the day to the Palmer residence because of a disturbance that had occurred due to drinking; (3) to show the inconsistencies between testimony given at the preliminary hearing and at trial; and (4) failure to call an expert to establish the significance of the barbiturates in the victim's blood. Nicholas says more specifically that his counsel talked to him only two times prior to trial, and then only for a total period of an hour and that the time was too brief to permit an in-depth interview of his defense and that as a consequence of such aborted review crucial information was not conveyed to Nicholas. However, Ex-

---

[2]Exhibit C-2, which has been attached to the petition, indicates Wade Foster was apparently helping the police in the recovery of one weapon and the capture of a second suspect.

hibits C-1 and C-2, letters from Nicholas' attorney to Nicholas heretofore alluded to, indicate that all of the above alleged defaults of counsel were considered in depth and that there was a line of communication between Nicholas and his counsel unimpeded throughout the trial.

Nicholas urges further that he was unaware of his counsel's inability to find Michael Faulk. Faulk, he asserts, was a material witness who would have impeached Chisom and would have testified that Chisom could not have perceived what she testified to. Exhibit C-1 clearly indicates that counsel was diligent in trying to find Faulk, and Exhibit J-1 indicates that Faulk had told the police that he did not see anything that had occurred that night, since he was high on beer and had fallen asleep. Counsel was aware of this factor as well. The record indicates that Faulk had disappeared and could not be found and an unsuccessful attempt to find him was made.

Nicholas charges that his counsel failed to interview Palmer; that she would have established that Chisom was involved in an altercation earlier that afternoon and was drunk. He avers more consultation would have emphasized this point. Exhibit C-1 shows that Nicholas' counsel felt satisfied with the evidence of the drinking and the conduct of the people in the Palmer residence, and did not need additional testimony, and excellent reasons are assigned by counsel for not calling Palmer. Calling or not calling Palmer to testify was clearly a matter of tactics. (*People* v. *Peralez* (1971) 14 Cal.App.3d 368, 378 [92 Cal.Rptr. 256].)

It may be that Nicholas was not informed in daily detail of counsel's activities, but the record does affirmatively show that Nicholas was kept reasonably informed. It would be well, however, if counsel would remember that they represent a person and not a file. (See, e.g., Hufstedler, *Lawyers, Morality and Public Approval* (1974) 49 State Bar J. 10, 14.)

Petitioners next contend that counsel failed to fully impeach the witnesses by use of their testimony at the preliminary hearing. Primarily this issue goes to the impeachment of Chisom. They urge that lack of exploitation of three instances in which her testimony differs, shows incompetence. None of the three instances are significant in the overall posture of the case, and counsel might well have felt that an attempted impeachment would have been of little value in the total picture conveyed to the jury.

The argument is made that counsel failed to bring in expert testimony to show the significance of the barbiturate level in the victim's blood; a showing that the barbiturate level was high could have led the jury to infer

that everyone in the house was drinking and using drugs, and such inference would have effectively impeached Chisom. However, counsel did exactly that. The pathologist on direct examination stated that the deceased had the equivalent of two or three drinks in his blood stream and there may have been more alcohol in the stomach not yet assimilated into the blood stream. On cross-examination counsel brought out the fact that there were also barbiturates in the blood and that the barbiturate level was a significant amount.

Other issues raised have been examined and are without merit.

The issues discussed affected the rights of both petitioners. The petition charges only counsel for Nicholas with incompetency. Conveniently overlooked is the fact that there were two counsel at trial. Except for alleged failure to move to suppress or object to the phone interception and the lack of challenge to the jury, no charges of incompetency are leveled at Standifer's counsel.

Due process does not require errorless counsel, nor does it obligate a court to judge by hindsight whether counsel has been as effective as he might have been. All that is required is counsel reasonably likely to render and one who renders reasonably effective assistance, under all the circumstances of the case. Determining whether the demands of due process were met in such a case as this requires a decision as to whether upon the whole course of the proceedings, and in all the attending circumstances, there was a denial of fundamental fairness; it is inevitably a question of judgment and degree. (*Brubaker* v. *Dickson* (9th Cir. 1962) 310 F.2d 30, 37.)

At bench counsel rendered more than reasonably effective assistance. The fact that the jury deliberated over two days before they finally reached a verdict is in itself evidence that the trial was not just a "farce or a sham" (*People* v. *Ibarra* (1963) 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487]) and that petitioners received a fair trial.

The respective judgments in Crim. 23790 are affirmed. The writ prayed for in the petition in Crim. 24951 is denied, and the petition is dismissed.

Compton, J., and Beach, J., concurred.

A petition for a rehearing was denied May 22, 1974, and appellants' petitions for a hearing by the Supreme Court were denied June 19, 1974.