[Crim. No. 15114. Fourth Dist., Div. One. Nov. 5, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
CHERYL ANN MINICHILLI et al., Defendants and Appellants.

**[Opinion certified for partial publication.[1]]**

[1]Certified for publication with the exception of sections I through IV and X.

**COUNSEL**

Geraldine S. Russell, Lewis A. Wenzell, Victoria Sleeth and Jeffrey J. Stuetz, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Frederick R. Millar, Jr., Michael D. Wellington, Deborah D. Factor and A. Wells Petersen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STANIFORTH, Acting P. J.**—A jury convicted codefendants Cheryl Ann Minichilli and Theodore Calvin Burtt as charged with murder (count one, Pen. Code, § 187[2]) and robbery (count two, § 211) of Hector Lopez. Four special circumstances alleged against Burtt only were also found true. The jury found the murder was: (1) intentional and involved infliction of torture (§ 190.2, subd. (a)(18)); (2) especially heinous, atrocious or cruel (§ 190.2, subd. (a)(14)); (3) intentionally accomplished by the administration of poison (§ 190.2, subd. (a)(19); and (4) committed during the commission of robbery (§ 190.2, subd. (a)(17)(i)).

Burtt was sentenced to life imprisonment without possibility of parole. Minichilli was sentenced to the term of 25 years to life in prison. Each defendant received an upper term sentence for the robbery which was stayed pursuant to section 654. Defendants appeal, claiming improper denial of pretrial motions, evidentiary and instructional errors warrant reversal of their respective convictions.

The judgments convicting Minichilli of murder and robbery must be reversed because the jury did not receive instructions on the requisite intent of an aider and abettor. (*People* v. *Beeman* (1984) 35 Cal.3d 549 [199 Cal.Rptr. 60, 674 P.2d 1318].) Reversal is required upon a second ground since Minichilli was probably convicted of robbery and first degree felony murder upon an aiding and abetting theory of culpability without consideration by the jury of the effect of intoxication upon her intent. As to Minichilli, we address only those issues which are likely to arise in the event of retrial. The judgments convicting Burtt of murder and robbery are affirmed but the special circumstance finding under section 190.2, subdivision (a)(14), is ordered stricken.

### FACTS

At approximately 3:20 a.m., September 21, 1981, Hector Lopez died from pulmonary edema caused by inhalation of liquid chloropicrin fumes. Chloropicrin is a highly toxic chemical similar to tear gas but substantially more powerful. Chloropicrin is used in pesticides in highly diluted concentrations to warn of the dangerousness of pesticides by its unpleasant odor and irritant qualities.

Lopez was a clerk at the Eastridge Liquor Store in La Mesa. On September 20, 1981, just before midnight, Lopez was preparing to close the store

---

[2]All statutory references are to the Penal Code unless otherwise specified.

when Burtt and Minichilli arrived. Lopez knew both Burtt and Minichilli. Burtt lived near the store and was a frequent customer. Upon entering the store, Burtt went to the restroom while Minichilli spoke with Lopez. When Burtt came out of the restroom, he threw the contents of a mayonnaise jar containing liquid chloropicrin on Lopez.

Screaming, Lopez ran immediately from the store. A La Mesa police officer patroling the vicinity saw Lopez. The officer was unable to get close to Lopez because he was overwhelmed by the fumes emanating from Lopez' body which caused tearing and burning of the officer's eyes and nose as well as difficulty in breathing. The officer was forced to roll bottles of saline to Lopez so he could rinse himself with the saline to relieve pain and discomfort. Shortly thereafter, another officer arrived at the scene. He found a water hose and tried to wash off Lopez' body until an ambulance arrived. While waiting for the ambulance, Lopez was screaming and indicated someone had thrown acid on him. Lopez identified that person as "Ted." Lopez also told the officers a former female store employee was with Ted at the time.

At the hospital Lopez gave the officers Minichilli's full name, Burtt's first name, physical descriptions of the two suspects, a description of Minichilli's car and told them where Minichilli worked. Medical efforts to save Lopez were unsuccessful; at 3:20 a.m. he died, virtually drowning in his own body fluids.

Dr. Skivlocki, the physician treating Lopez in the hospital emergency room, needed information concerning the identity of the substance producing Lopez' injuries and symptoms. Lloyd Smithson, owner of the liquor store, was contacted by police for more information about Minichilli. The information provided by Smithson and additional information provided by a records check produced Minichilli's home address.

Police officers arrived at Minichilli's home at approximately 5 a.m. Minichilli answered the door. The officers identified themselves and confirmed she was Minichilli. Minichilli matched Lopez' description of the female suspect. Officer Bascom advised her they were there to talk about "what had happened earlier in the evening with she [*sic*] and Ted." They requested permission to check inside her home for the officers' safety. The officers did not have a warrant for Minichilli's arrest. During a brief check of the premises, the officers did not find anyone else present and did not observe any jars or containers which might have contained liquid similar to that producing Lopez' injuries.

Before she was advised of her constitutional rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]),

Minichilli told the officers she was waiting until later "to call Smitty [Lloyd Smithson] to find out how Hector was." After she was advised of her rights, Minichilli said she did not know what the chemical was and that none of it was in her house—that two glass jars containing the fluid had been left in the store. While talking to Minichilli, officers saw a wallet on the table, searched it and found Burtt's identification. Minichilli was then arrested for robbery and murder of Lopez.

Minichilli was taken to the Los Colinas detention facility where she was examined by a nurse. Minichilli denied being in the store the previous night but when told the chemical posed an extremely dangerous health hazard to those exposed to it, Minichilli said she had been in the store and had suffered some symptoms associated with chloropicrin. During booking, officers found $285 in cash in Minichilli's purse, the cash was divided into packets of $100 and $185 each. Minichilli indicated the packets were to pay some debts.

Minichilli was interrogated at about 6:40 a.m. Minichilli indicated she had worked at the liquor store but had been laid off. She was familiar with closing procedures at the store but had never closed the store herself. The preceding day, Sunday, she drove to the store with Burtt as passenger, arriving about 10 to 15 minutes before closing. There were no other employees or customers in the store and she talked to Lopez while he was closing up. Minichilli also told the officers she had been smoking what she thought was marijuana the night before. She had smoked "three bongs," starting between 9 and 10 p.m. "I don't know if it made [me] black [out] or what [Minichilli said], but it made me not realize things. I couldn't see things straight, either like—not double vision, but everything looked very different and had a different texture to it."

Pursuant to Minichilli's written consent to search, a search of her home was made later on the day of the 21st. A drinking glass full of change was found in her kitchen. An empty dayshift daily register bank bag from the liquor store was found under a mattress. A search of Minichilli's car produced a credit card receipt for a purchase made with the card of a pest control company. The receipt was signed by Thomas Redding, an employee of Dehoyas Pest Control Company and Burtt's friend. When Minichilli's apartment was searched, the police seized a Schilling food coloring bottle from the refrigerator and a cigarette and bag of tobacco from the living room. Laboratory tests showed the bottle contained phencyclidine (PCP), and the cigarette and tobacco were laced with PCP.

Surveillance of Minichilli's apartment was established. Shortly after 9 a.m. on September 21, Burtt was observed entering Minichilli's house.

When officers entered the home to arrest Burtt, Burtt was gone and a rear window screen was pushed out. Burtt was spotted running from the house towards his apartment nearby. Burtt was arrested.

During questioning at the police station, Burtt indicated he had no idea what happened in the liquor store. He could not recall the evening's events but remembered being in the store but not how he got there. Burtt was not sure he had thrown anything at Lopez but said he "thought he had." Burtt stated "It happened. I didn't want it to happen. My mind is blank." He specifically recalled feeling as if his lungs had collapsed, having great difficulty breathing, and feeling like he wanted to run and run. He said he ended up at a church where he passed out on the ground. When he came to he said he felt sick and confused. When asked where he obtained the chloropicrin, Burtt said he thought he found the Miracle Whip jar in an alley next to a garbage can. When the interrogating officer indicated that that would be very unusual, Burtt indicated he thought he found the jar in a field somewhere. Like Minichilli, he said he had been smoking marijuana the night before. He said he also smoked a cigarette laced with PCP.

Firefighters, using special breathing equipment, entered the liquor store September 21 in order to locate the source of the overwhelming fumes emanating from inside the store. A clear, thick substance was found on the floor near the counter. Lopez' shirt, a broken mayonnaise bottle and a lid to the bottle were also found near the counter. Laboratory tests of these items revealed the substance was chloropicrin. Burtt's fingerprints were found on the jar. Two bags of money containing approximately $2,100 in cash was later discovered missing by Lloyd Smithson, owner of the store.

*Motive Evidence*

It was the prosecution's theory that Minichilli and Burtt had taken the money from the store because they both needed cash to pay debts and cover bounced checks. Burtt's bank was threatening to report a bad check to the police. Minichilli was afraid she was going to lose her job for passing bad checks.

The prosecution also introduced evidence in May and early June 1981 Burtt often used drugs such as D-Lysergic Acid Diethylamide (LSD), PCP, and marijuana with his friends Charles Florence, David Levine and Shawn McDermott. On several occasions Burtt and his friends discussed ways to get money for drugs. Burtt talked about committing robberies and said a person could use tear gas, sulphuric acid or swimming pool chlorine to temporarily blind or disable a store's clerk. Burtt also stated it would probably be necessary to kill the clerk.

Two of Burtt's acquaintances had access to chloropicrin: Tom Redding, who worked for Osvaldo Dehoyas' Pest Control Service, and Dehoyas' son, Gilbert.

*Defense Evidence*

A defense investigator interviewed Florence, Levine and McDermott before trial. During that interview Florence was unable to recall Burtt discussing ways to disable a person with acid or chlorine. Levine and McDermott recalled such discussions but also said at the time these discussions took place, everyone considered them to be a joke and no one actually had been planning a robbery.

Both Minichilli and Burtt informed police they were under the influence of drugs the night Lopez died. Blood and urine samples were not taken from Minichilli, but samples were taken from Burtt two days after his arrest. Burtt's urine sample showed the presence of PCP.

Dr. Allen Abrams, a psychiatrist, testified about the effects of PCP. PCP is a powerful drug which alters or tends to alter the user's perception of his or her capabilities. It also impairs memory because while the user is under the influence of PCP his or her mind is not "registering" sensory input. Often a person under the influence of PCP can appear normal and seem to function satisfactorily and then quite suddenly commit bizarre or violent acts. The psychiatrist further testified it is possible to achieve a very high level of intoxication yet show no outward symptoms of PCP use six to eight hours later. However, PCP stays in the system and may be detected through urine tests.

DISCUSSION

I*

. . . . . . . . . . . . . . . . . . . . . . . .

V

*Beeman Error Requires Reversal
of Minichilli's Convictions*

Minichilli contends the standard instructions on aiding and abetting read to the jury were inadequate for failing to instruct an aider and abettor have

*See footnote 1, *ante,* page 660.

shared the criminal intent of the person who actually committed the criminal act (robbery). Minichilli's request for such an instruction was refused. The jury received CALJIC Nos. 3.00 and 3.01 on aiding and abetting.[4]

■ After trial in this case, the decision in *People* v. *Beeman, supra,* 35 Cal.3d 547, was filed. *Beeman* holds CALJIC No. 3.01 incorrectly defines aiding and abetting by failing to adequately apprise the jury of the requisite intent for an aider and abettor. *Beeman* holds a jury must be instructed there must be "proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*Id.,* at p. 560.) CALJIC No. 3.00 has also been held defective for failing to correctly inform the jury of the requisite criminal intent for aiding and abetting, by defining a "principal" simply as one who acts with knowledge of the unlawful purpose of the perpetrator. (*People* v. *Caldwell* (1984) 36 Cal.3d 210, 224 [203 Cal.Rptr. 433, 681 P.2d 274].)

The Attorney General concedes *Beeman* error occurred but argues *Beeman* should not be retroactively applied to reverse Minichilli's convictions of first degree murder and robbery. The Attorney General argues even if *Beeman* error is retroactively applied, the *Watson*[5] standard of prejudice applies.[6] We conclude *Beeman* should be retroactively applied.

■ In *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24, 36-37 [196 Cal.Rptr. 704, 672 P.2d 110], the court explained: "In determining whether a decision should be given retroactive effect, the California courts undertake

---

[4]CALJIC No. 3.00 (1981 rev.) as read to the jury provides: "The persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed and equally guilty thereof, include: Those who directly and actively commit the act constituting the crime, or those who with knowledge of the unlawful purpose of the person who directly and actively commits the crime, aid and abet in its commission. [¶] One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged."

CALJIC No. 3.01 (1980 rev.) as read to the jury provides: "A person aids and abets in the commission of a crime if with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime. [¶] Mere presence at the scene of a crime which does not in itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

[5]*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].

[6]Hearings have been granted in *People* v. *Johnson* (Cal.App.) (hg. granted July 26, 1984 (Crim. 23867)) and other cases. The principle issue presented in these cases concerns the standard of prejudice for failure to properly instruct on the intent required for aiding and abetting.

first a threshold inquiry, inquiring whether the decision established new standards or a new rule of law. If it does not establish a new rule or standards, but only elucidates and enforces prior law, no question of retroactivity arises. [Citations.] Neither is there any issue of retroactivity when we resolve a conflict between lower court decisions, or address an issue not previously presented to the courts. In all such cases the ordinary assumption of retrospective operation [citations] takes full effect." (See also *People* v. *Garcia* (1984) 36 Cal.3d 539, 547-548 [205 Cal.Rptr. 265, 684 P.2d 826].) Since *Beeman* resolves conflict in appellate opinions between those cases finding *knowledge* of the perpetrator's criminal purpose sufficient (e.g., *People* v. *Ott* (1978) 84 Cal.App.3d 118 [148 Cal.Rptr. 479]; *People* v. *Standifer* (1974) 38 Cal.App.3d 733 [113 Cal.Rptr. 653]) and those cases requiring *intent* to support a conviction upon aiding and abetting (e.g. *People* v. *Yarber* (1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875]; *People* v. *Petty* (1981) 127 Cal.App.3d 255 [179 Cal.Rptr. 413]), *Beeman* should be given retroactive effect as to those cases not yet final.[7]

*Beeman* left open the question the standard of prejudice applicable in cases involving failure to instruct on the requisite intent of an aider and abettor. *People* v. *Garcia, supra,* 36 Cal.3d 539, 554, footnote 9, suggests *Beeman* error is prejudicial per se. Since we conclude, however, even under the most lenient standard of prejudice under *Watson,* the convictions of first degree murder and robbery must be reversed, we need not and do not decide whether the stricter standard enunciated in *Chapman* is applicable.

The facts concerning Minichilli's involvement in the robbery include: As a former employee of the liquor store, Minichilli was familiar with closing procedures followed by the store. A few weeks prior to the robbery, Minichilli and Burtt went to the store just before closing. On the night of the robbery Minichilli drove her car with Burtt as passenger to the liquor store, arriving just before closing. Lopez had already turned out some of the lights in the store and was getting some of the money bags together when defendants arrived. Although three employees are usually present during closing, Lopez was alone. Minichilli engaged Lopez in conversation while Burtt went to the restroom. Lopez was counting money from one of the registers. After the robbery, large sums of money were found in Minichilli's purse and a bank bag from the liquor store was found under a mattress in Minichilli's home. There was evidence Minichilli smoked marijuana and some PCP on the eve of the robbery.

■ The jury received instructions on specific intent required to find a defendant guilty of robbery. The jury was also instructed to consider the

---

[7]*People* v. *Caldwell, supra,* 36 Cal.3d 210, 223-224, retroactively applied *Beeman* without specifically discussing the issue of retroactivity.

effect of intoxication upon specific intent. "[W]here specific intent is a necessary element of the crime, the jury may consider the fact of the defendant's voluntary intoxication." (*People* v. *Foster* (1971) 19 Cal.App.3d 649, 654 [97 Cal.Rptr. 94].) Absent an instruction on the required intent of an aider and abettor, Minichilli was deprived of her right to have the jury consider the effect of intoxication upon the "intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People* v. *Beeman, supra,* 35 Cal.3d 547, 560.)

Since the jury may have convicted Minichilli of robbery as an aider and abettor and since evidence she was intoxicated was not considered by the jury in that context, it is reasonably probable a result more favorable to defendant would have been reached in the absence of the error. Since it is also possible the jury convicted Minichilli of first degree murder upon an aiding and abetting felony-murder theory of culpability, the judgment of conviction of first degree murder as well must be reversed.[8]

## VI

### *Proper Instructions Were Given on Murder by Torture*

■ Burtt independently urges the conviction for first degree murder requires reversal because the conviction might have been based upon a torture theory[9] and the jury was not instructed it had to first find malice before finding first degree murder under that theory. Burtt urges malice cannot be implied from the use of torture itself.

■ Murder by torture under section 189 requires "independent proof beyond a reasonable doubt the crime was murder, i.e., an unlawful killing with malice aforethought (*People* v. *Dillon* (1983) 34 Cal.3d 441, 465 . . .) and there must be a similar degree of proof of a coldblooded, calculated intent to inflict extreme and prolonged pain for the purpose of revenge, extortion, persuasion, or for any sadistic purpose (*People* v. *Wiley* (1976)

---

[8] In a related contention, Minichilli argues the trial court erroneously refused requested instructions "relating intoxication to the knowledge element of aiding and abetting." Minichilli also contends the trial court erroneously refused the requested instructions on accessory after the fact. As we reverse the convictions on the basis of *Beeman* error, we need not, and do not address the merits of these remaining contentions.

[9] Section 189 provides: "All murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree. . . ."

18 Cal.3d 162, 173, fn. 4 . . .; *People* v. *Tubby* (1949) 34 Cal.2d 72, 77 . . .)." (*People* v. *Lynn* (1984) 159 Cal.App.3d 715, 726 [206 Cal.Rptr. 181].)

■ In determining whether the jury was correctly instructed, all instructions given must be considered together. (*People* v. *Northrop* (1982) 132 Cal.App.3d 1027, 1037-1038 [182 Cal.Rptr. 197]; *People* v. *Lynn, supra,* 159 Cal.App.3d 715, 729.) ■ The jury was fully and correctly instructed on murder and malice. CALJIC No. 8.24 instruction on murder by torture as read to the jury provides: "*Murder* which is perpetrated by torture is murder of the first degree. [¶] The essential elements of murder are: The act or acts which caused the death must involve a high degree of probability of death; and the defendant must commit such act or acts with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain. [¶] The crime of *murder* by torture does not necessarily require proof that the defendant intended to kill the deceased, nor does it necessarily require any proof that the deceased suffered pain." (Italics added.)

Contrary to Burtt's contention, the jury was correctly first instructed it must find malice aforethought in order to find murder. The jury then was instructed to fix the degree of murder in consideration of the factors listed in CALJIC No. 8.24. No instructional error on this ground appears.

## VII

### *Instructions on Grand Theft Not Required*

■ Defendants jointly contend Burtt's conviction of first degree murder and robbery must be reversed because the jury was not instructed *sua sponte* on the lesser included offense of grand theft. Instructions on grand theft were not requested. It is argued the trial court was required to give the instructions *sua sponte* based on evidence defendants' motives may not have been to commit robbery and an intent to steal, therefore, was not formed until after the chloropicrin was thrown at Lopez.

Theft is a lesser included offense of robbery. (*People* v. *Harris* (1979) 93 Cal.App.3d 103, 118 [155 Cal.Rptr. 472].) The trial court is required to instruct on the general principles of law relevant to the issues raised by the evidence which include "giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913].) "The trial court is not obligated to instruct *sua sponte* on necessarily included

offenses unless the evidence would justify a conviction of such offenses.'' (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 325 [185 Cal.Rptr. 436, 650 P.2d 311].)

Substantial evidence was introduced which established robbery was the purpose of defendants' presence in the liquor store including: Both defendants were in serious financial trouble. Burtt had stolen a check from his brother and Minichilli had used her position as a bank employee to help Burtt cash it. Both Minichilli and Burtt had written bad checks for which they had no funds. Burtt had discussed robbery as a means of obtaining money for drugs and using chemicals to facilitate the crime. Also, about a week before the charged offenses occurred, Minichilli and Burtt came to the liquor store shortly before closing.

The only evidence presented intent to steal developed after the chloropicrin was thrown at Lopez was evidence through the victim's statements Minichilli had been fired from her job at the liquor store for drug use on the premises. However, as earlier discussed, there was *no* evidence Minichilli was ever informed she was fired for those activities.[10] The evidence was insufficient to warrant giving instructions on grand theft. (See *People* v. *Sedeno, supra,* 10 Cal.3d 703, 716; *People* v. *Wickersham, supra,* 32 Cal.3d 307, 324.)

Defendants' claim Burtt's conviction of first degree murder is affected by failure to instruct on grand theft is also not well taken. The jury finding of special circumstance, murder by torture (§ 190.2, subd. (a)(18)) warrants this conclusion: the conviction for first degree murder may be supported on the basis of torture murder alone.

## VIII

### *Instructions on Second Degree Felony Murder Were Not Required*

Defendants jointly contend Burtt's conviction of first degree murder must be reversed because the jury was not instructed on second degree felony murder. The jury was properly and correctly instructed on second degree murder but no instruction was given, *sua sponte,* on second degree felony murder. Burtt contends an instruction on second degree felony mur-

---

[10]The circumstances of the encounter between Lopez and defendants also tend to establish theft was in the minds of defendants before the chloropicrin was thrown on Lopez. Defendants entered the store and greeted Lopez. Burtt asked to use the restroom. Minichilli then engaged Lopez in conversation. Burtt returned from the restroom and participated in conversations. Burtt then threw the chloropicrin upon Lopez.

der should have been given because there is sufficient evidence from which the jury could infer he used the "chloropicrin only for the purpose of making Hector Lopez ill and temporarily incapacitating him, with no intent to kill or injure him, and with no knowledge the chemical would do so."

Second degree felony murder is a recognized theory of culpability when a felony inherently dangerous to human life, exclusive of those enumerated in section 189,[11] has been committed without intent to commit injury which would cause death. (*People* v. *Mattison* (1971) 4 Cal.3d 177, 184-185 [93 Cal.Rptr. 185, 481 P.2d 193].) Absent an intent to kill, the act of throwing the chloropicrin was a violation of section 375, subdivisions (a) and (d).[12]

An instruction relating to a lesser included offense must be given when the evidence raises a question as to whether all of the elements of the charged offense were present. (*People* v. *Wickersham, supra,* 32 Cal.3d 307, 323.) Instructions on second degree felony murder were not required here because the evidence did not raise a question whether Burtt harbored the requisite malice or intent to kill when he threw the chloropicrin at Lopez. In this case, the evidence provided a practically overwhelming inference of intent to kill. Testimony was presented concerning discussions by Burtt with friends about using chemicals during robberies and the necessity to kill to avoid identification. The most inculpating evidence, however, was the uncontroverted evidence Lopez knew both Burtt and Minichilli and could, therefore, easily identify them as the robbers. The evidence mandated a conclusion Burtt intended to kill Lopez to avoid identification as the robber.

Arguments by defense counsel to the jury the People failed to present direct evidence Burtt was familiar with the deadly properties of chloropicrin were simply unpersuasive under the particular facts of this case. This was

---

[11]See footnote 9, *ante,* at page 671.

[12]Section 375, subdivision (a), provides: "It shall be unlawful to throw, drop, pour, deposit, release, discharge or expose, or to attempt to throw, drop, pour, deposit, release, discharge or expose in, upon or about any theater, restaurant, place of business, place of amusement or any place of public assemblage, any liquid, gaseous or solid substance or matter of any kind which is injurious to person or property, or is nauseous, sickening, irritating or offensive to any of the senses."

Section 375, subdivision (d), provides: "Any person who, in violating any of the provisions of subdivision (a), willfully employs or uses any liquid, gaseous or solid substance which may produce serious illness or permanent injury through being vaporized or otherwise disbursed in the air or who, in violating any of the provisions of subdivision (a), willfully employs or uses any tear gas, mustard gas or any of the combinations or compounds thereof, or willfully employs or uses acid or explosives, shall be guilty of a felony and shall be punished by imprisonment in the state prison."

not a killing which resulted merely from a violation of section 375, subdivisions (a) and (d).

## IX

### *Special Circumstances*

Burtt separately contends three of the four special circumstance allegations found true must be stricken. Burtt contends the special circumstance finding the murder was "especially heinous, atrocious, or cruel, manifesting exceptional depravity" under section 190.2, subdivision (a)(14), must be stricken. The Attorney General concedes this special circumstance must be stricken because section 190.2, subdivision (a)(14), was declared unconstitutionally vague in *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797 [183 Cal.Rptr. 800, 647 P.2d 76].

■ Burtt next contends the murder by torture special circumstance finding under section 190.2, subdivision (a)(18), must be stricken because the jury was improperly instructed specific intent to kill was not required to make the finding. The same murder-by-torture instruction read to the jury on the murder charge was repeated to the jury on the torture murder special circumstance allegation. That instruction informed the jury specific intent to kill was not required in order to find murder by torture. The instruction was correct as applied to the murder charge. It was not correct, however, as to the special circumstance allegation.

Section 190.2, subdivision (a)(18), provides: "The murder was intentional and involved the infliction of torture. For the purpose of this section torture requires proof of infliction of extreme physical pain no matter how long its duration." Specific intent to kill is required to prove murder by torture in order to invoke the greater penalty of life imprisonment without possibility of parole or death. (Cf. *People* v. *Ross* (1979) 92 Cal.App.3d 391, 402 [154 Cal.Rptr. 783].)

Although it was error not to instruct specific intent to kill was required in order to find the murder-by-torture special circumstance to be true, the error was manifestly harmless. Harmless error appears from the special circumstance finding under 190.2, subdivision (a)(19). That special circumstance requires the defendant intentionally killed the victim by administration of poison. The jury was instructed in order to find as true the special circumstance alleged under section 190.2, subdivision (a)(19), proof "the killing was intentional; and that defendant committed the murder by administration of poison" was required. Since the jury necessarily found Burtt intentionally killed in order to find as true the special circumstance of mur-

der by poison, the fact question whether he harbored the intent to kill in conjunction with the murder-by-torture special circumstance was necessarily resolved against him. Burtt was thus not deprived of his constitutional right to have the jury determine every material issue necessary to the finding of murder by torture special circumstance. No prejudice resulted from the failure to instruct the jury on specific intent to kill.

Burtt contends the robbery special circumstance (§ 190.2, subd. (a)(17)(i)) finding must be stricken because the jury was not instructed proof of intent to kill was required. Section 190.2, subdivision (a)(17)(i), provides: "(a) The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without possibility of parole in any case which . . .:

"… . . . . . . . . . . . . . . . . . . . . . .

"(17) The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit . . .:

"(i) Robbery in violation of Section 211."

*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], construes section 190.2, subdivision (a)(17)(i), to require intent to kill or to aid in the killing as an element of the felony-murder special circumstance. *Carlos* retroactively applies to this case by virtue of *People* v. *Garcia, supra,* 36 Cal.3d 539. *Garcia* holds, absent exceptional considerations, failure to give instructions on intent to kill as an element of felony-murder special circumstance is reversible error per se. One of the suggested exceptions to the rule of per se reversal arises when " '. . . the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant . . . .' " (*Garcia,* 36 Cal.3d, at p. 555; fn. omitted.)

The facts here present an exception to the rule of per se reversal. As previously discussed, the issue of intent to kill was adversely resolved against Burtt under other, properly given instructions on the murder-by-poison special circumstance. Since intent to kill was necessarily found under those instructions, Burtt was not prejudiced by failure to instruct intent to kill was necessary to a finding of felony-murder special circumstance.

X*

. . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments convicting Minichilli of first degree murder and robbery are reversed. The judgments convicting Burtt of first degree murder and robbery are affirmed; the special circumstance finding under section 190.2, subdivision (a)(14), must be stricken.

Work, J., and Butler, J., concurred.

A petition for a rehearing was denied November 20, 1984, and the petitions of appellant Burtt and respondent for a hearing by the Supreme Court were denied February 14, 1985.

---

*See footnote 1, *ante,* page 660.